## Restifo *v.* McDonald, Appellant.

6

Argued November 16, 1966. Before BELL, C. J., MUSMANNO, JONES, COHEN, EAGEN, O'BRIEN and ROBERTS, JJ.

reargument refused June 26, 1967.

*Harry R. Nixon*, with him *Michael A. Foley*, for appellant.

*Leonard S. Wissow*, with him *Wissow and Odza*, for appellee.

Opinion by Mr. Justice Roberts, May 24, 1967:

Joseph V. Restifo (erroneously named "John" in this appeal) and his wife Eleanor instituted an action of trespass on behalf of themselves and their minor children against the Estate of William McDonald, appellant, for personal injuries and property damages sustained in an automobile accident on August 20, 1963. McDonald's administratrix filed an answer and new matter joining the co-plaintiff, Eleanor Restifo, appellee, as an additional defendant with respect to the claims of her minor children on the theory that she was solely liable to the plaintiffs or liable for contribution.[1] In her reply, the appellee pleaded a written release given her by McDonald in return for $450. The court below sustained appellee's motion for judgment on the pleadings and this appeal followed.

In support of her position, Mrs. Restifo relies principally upon *Polley v. Atlantic Refining Co.*, 417 Pa. 549, 207 A. 2d 900 (1965),[2] where this Court on the authority of *Killian v. Catanese*, 375 Pa. 593, 101 A. 2d 379 (1954), held that when A obtains a general release from B, B cannot join A as an additional defendant in a subsequent suit, arising out of the same cause of action, instituted against B by C.[3] We agree with

---

[1] Pennsylvania's intrafamily immunity doctrine would prevent plaintiffs from obtaining a judgment against Mrs. Restifo; nevertheless, she would remain liable to the appellant for contribution if she were found to be a joint tortfeasor. See *Puller v. Puller*, 380 Pa. 219, 110 A. 2d 175 (1955); *Fisher v. Diehl*, 156 Pa. Superior Ct. 476, 40 A. 2d 912 (1945); see generally, Note, 52 Cornell L.Q. 407 (1967).

The writer of this opinion has expressed his own disagreement with the intrafamily immunity doctrine in *Daly v. Buterbaugh*, 416 Pa. 523 537, 207 A. 2d 412, 418 (1964) (dissenting opinion).

[2] Only three members of the Court joined the *Polley* opinion; two members concurred in the result and two dissented.

[3] See also *Rimpa v. Bell*, 413 Pa. 274, 196 A. 2d 738 (1964); *Moyer v. Independent Oil Co., Inc.*, 401 Pa. 335, 164 A. 2d 552 (1960); *Mayer v. Knopf*, 396 Pa. 312, 152 A. 2d 482 (1959). But

Mrs. Restifo that unless, as requested by the appellant, these cases are overruled, the judgment of the trial court must be affirmed.

The release in the instant case, which was almost identical with the releases involved in *Polley v. Atlantic Refining Co.*, supra, and *Rimpa v. Bell*, 413 Pa. 274, 196 A. 2d 738 (1964), stated:

"KNOW ALL MEN BY THESE PRESENTS, that I, WILLIAM MCDONALD, 6411 North 21st Street, Philadelphia, Pa., for the sole consideration of Four Hundred fifty and no/100 ($450.00) dollars to me in hand paid by JOSEPH V. RESTIFO and ELEANOR RESTIFO, of 6600 Ardleigh Street, Philadelphia, 19, Pa., the receipt whereof is hereby acknowledged, have released and discharged and by these presents, do for myself, my heirs, executors, administrators, successors and assigns release and forever discharge JOSEPH V. RESTIFO and ELEANOR RESTIFO of and from all claims, demands, damages, actions, causes of action, or suits at law or in equity, of whatsoever kind or nature for or because of any matter or thing done, omitted or suffered to be done by said JOSEPH V. RESTIFO and ELEANOR RESTIFO prior to and including the date hereof, and particularly on account of all injuries both to person or property resulting, or to result, from an accident which occurred on or about the 20th day of August, 1963 at or about 6:30 P.M. at or near the intersection of Briar Road and Washington Lane, Philadelphia, Pa."

Conceivably, as the Court did in the *Killian-Polley* line of cases, one could read this document as encompassing the right to seek contribution. However, our considered re-evaluation compels the conclusion that not only was the rationale of these cases unsound but that they are also incompatible with the rules of con-

---

see, *Kent v. Fair*, 392 Pa. 272, 140 A. 2d 445 (1958); *Davis v. Miller*, 385 Pa. 348, 123 A. 2d 422 (1956). *Killian* itself is critically reviewed in 27 Temple L.Q. 515 (1954).

struction governing releases. Therefore, to the extent that these cases are inconsistent with this opinion they are hereby overruled.

A long line of Pennsylvania cases has held that a release covers only those matters which may be fairly said to have been within the contemplation of the parties when the release was given. See, e.g., *Wenger v. Ziegler*, 424 Pa. 268, 226 A. 2d 653 (1967); *Brill's Estate*, 337 Pa. 525, 12 A. 2d 50 (1940); *Flaccus v. Wood*, 260 Pa. 161, 103 Atl. 549 (1918); *Shepley v. Lytle*, 6 Watts 500 (1837); *General Mills, Inc. v. Snavely*, 203 Pa. Superior Ct. 162, 199 A. 2d 540 (1964); *Cockcroft v. Metropolitan Life Ins. Co.*, 125 Pa. Superior Ct. 293, 189 Atl. 687 (1937). Accordingly, the general words of the release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of the release. See *Henry Shenk Co. v. Erie*, 352 Pa. 481, 43 A. 2d 99 (1945); *Zurich General Acc. & Liab. Ins. Co. v. Klein*, 181 Pa. Superior Ct. 48, 55-56, 121 A. 2d 893, 896 (1956).

*Cady v. Mitchell*, 208 Pa. Superior Ct. 16, 220 A. 2d 373 (1966), is a recent illustration of the rule mandating strict construction of a release so as to avoid the ever present possibility that the releasor may be overreached. Cf. *Wenger v. Ziegler*, supra; *Henry Shenk Co. v. Erie*, supra; compare *Linda Coal & Supply Co. v. Tasa Coal Co.*, 416 Pa. 97, 100, 204 A. 2d 451, 453 (1964). In *Cady*, plaintiffs had given the defendant a general release for all claims arising out of an automobile accident, including "all unknown, unforeseen, unanticipated, and unsuspected injuries." The release was signed nine days after the accident; the consideration for it being the lowest estimate received by the plaintiffs for the repair of their automobile. At the time the release was executed neither party suspected that Mrs. Cady had suffered any bodily injury; indeed defendant's insurance adjuster testified that he had

included Mrs. Cady in the release only as an extra precaution. Subsequently, Mrs. Cady developed symptoms which indicated that she had sustained bodily injuries in the accident. Although viewing the release as prima facie evidence of payment and settlement, nevertheless, the Superior Court, speaking through Judge MONT-GOMERY, sustained, without dissent, the jury's action in voiding the release. The court held, in accord with the rule in a majority of sister jurisdictions,[4] that since neither party contemplated personal injuries on the part of Mrs. Cady, the release could not be construed to cover them: "The circumstances, including the details as to when, where and how the releases were secured, and the inadequacy of the consideration, [were] all matters reflecting on the meeting of the minds of the parties and collectively support the jury's action." 208 Pa. Superior Ct. at 21, 220 A. 2d at 375.[5]

In a similar vein it would be illogical to assume that, with respect to the right of contribution, there was a meeting of the minds in the instant case. The releasing party, unless he is a lawyer, is unlikely to be cognizant of this potential right, a right which in any event does not accrue until after an action has been instituted against the releasor by a third party.[6] (It is worth noting that if the additional defendant were sued by the third party, he could seek contribution from the joint tortfeasor.[7]) Instead the releasing party is most apt to regard the release as a contract which constitutes the successful settlement of his claim against the releasee.

---

[4] 208 Pa. Superior Ct. at 19-20, 220 A. 2d at 374-75; see Annot., 71 A.L.R. 2d 82 (1960).

[5] For an approving comment on the court's approach in *Cady*, see 28 U. Pitt. L. Rev. 109 (1966).

[6] See cases cited supra, p. 9.

[7] Uniform Contribution Among Tortfeasors Act, Act of July 19, 1951, P. L. 1130, 12 P.S. §2082 et seq. (Supp. 1966).

Perhaps the most troublesome aspect of the *Killian-Polley* cases is that they actually encourage fraud and deception. For example, consider the following hypothetical: P, a close friend of D-2 and a passenger in his car, is injured through the joint negligence of D-2 and D-1. In the same automobile accident D-1's car is slightly damaged. If P waits until D-2, or his insurance company, buys a release from D-1 before instituting a lawsuit, he may be able to obtain full recovery from D-1 and keep D-2's friendship. In some instances D-2 might even purchase P's patience; at least in many cases, such as the instant one, P and D-2 are apt to have a common interest so that these tactics will work to their mutual benefit.[8]

Our opinion in this case, of course, does not prevent the parties from contracting for the release of the right to seek contribution in the event of a lawsuit by a third party, for "it is well settled that where the terms of a release and the facts and circumstances existing at the time of its execution indicate the parties had in mind a general settlement of accounts, the release will be given effect according to its terms." *Brill's Estate,* 337 Pa. 525, 528, 12 A. 2d 50, 52 (1940). All we hold is that in the circumstances of the instant case such a contract must show that a release of the right to seek contribution was bargained for and within the parties' contemplation. Properly construed the release involved in the instant litigation merely prohibits recovery on an action which originates with the releasor.

Judgment reversed and record remanded for proceedings not inconsistent with this opinion.

---

[8] If the releasor is insured, his insurance company, which is not a party to the release, will under the *Killian-Polley* cases be denied its right of subrogation against the joint tortfeasor.

12

The *General* Release in this case is crystal clear, totally and completely comprehensive and all-inclusive. It encompasses within its boundaries *a release and a forever-discharge* of Eleanor Restifo *from all claims and demands and actions and suits* at law or in equity which the imagination of man can conceive. Yet the Majority blandly ignore its clear language and its clear meaning, and drastically rewrite this *General* Release in order to achieve what they believe is equitable.

Changing the clear language and the clear meaning of statutes, contracts, written instruments, wills, and even the Constitution itself, or rewriting them, has been considered, until recently, beyond the powers, functions and duties of a Court. Furthermore, this *General* Release of every imaginable claim is made even more impregnable (except for fraud) and iron-clad by the *specific* and *particular* provision which supplements the general provision and releases defendant, beyond even the peradventure of a doubt, from all claims *on account of all injuries both to person or property resulting or to result* from the accident which occurred on or about the 20th day of August 1963, at the time and place stated therein.

This *General* Release is the clearest and most comprehensive ever drawn, and it has become virtually a universally used document. Such General Releases have become, at the whim of the Majority of the present Court, relatively or virtually meaningless. It is regrettable to have to say that today statutes, contracts and every form and kind of written agreements, and even the clearest provisions of the Constitution of Pennsylvania and the Constitution of the United States, under the decisions of this Court, mean not what they clearly say, nor what prior Courts have often construed them to say and mean, but mean what the Majority of the present Court sincerely believe,

under the facts of a particular case and in the interest of equity or justice, they should have said, but didn't.

In order to achieve their result, the Majority have expressly overruled five recent decisions of this Court which are directly and squarely in point: *Polley v. Atlantic Refining Company,* 417 Pa. 549, 207 A. 2d 900; *Rimpa v. Bell,* 413 Pa. 274, 196 A. 2d 738; *Moyer v. Independent Oil Company,* 401 Pa. 335, 164 A. 2d 552; *Mayer v. Knopf,* 396 Pa. 312, 152 A. 2d 482; *Killian v. Catanese,* 375 Pa. 593, 101 A. 2d 379. We pause to ask: How, under the Majority Opinion, is it possible to have an *effective General Release?* How is it possible, unless it is a hybrid general and particular release which specifies and specifically includes therein every particular event which occurs or ever may occur, and every fact and every situation which arises or ever may arise?

To summarize, there is absolutely no reason or justification whatever for overruling the aforesaid recent prior decisions of this Court.

## Stare Decisis and Its Exceptions

I am very greatly disturbed by the virtual elimination of the principle of stare decisis, on which the House of Law was built. In the last half dozen years the Supreme Court of Pennsylvania has overruled cases in over forty different areas of the law which had been, prior thereto, firmly established. Today no one knows from week to week, or from Court session to Court session, whenever the Supreme Court meets, what the law will be tomorrow, or what are one's rights, privileges, responsibilities and duties.

In a Constitutional republican form of Government such as ours, which is based upon law and order, *Certainty and Stability are essential.* Unless the Courts establish and maintain certainty and stability in the law, Government cannot adequately protect law-abid-

ing persons or communities against criminals; businessmen cannot safely and wisely make contracts with their employees or with each other; the meaning of wills, bonds, contracts, deeds and leases will fluctuate and change with each change in the personnel of a Court; property interests and property rights will be jeopardized and frequently lost or changed; private citizens will not know their rights and obligations; and public officials will not know from week to week or month to month the powers and limitations of Government. This has been recognized for centuries by English-speaking peoples. Lord Coke, Chief Justice of England, thus wisely expressed (circa 1600) these truths: "The knowne certaintie of the law is the safetie of all." This has been a beacon light for Anglo-American Courts, for text authorities, and for law-abiding Americans ever since the foundation of our Country. In the realm of the law it is usually expressed in the principle known as Stare Decisis. Stare Decisis is one of the bed-rocks upon which the House of Law has been errected and maintained.

Mr. Justice FRANKFURTER, in his concurring Opinion in *Green v. United States,* 356 U.S. 165, 192 (1958), said: "To be sure, it is never too late for this Court to correct . . . an *occasional decision,* even *on a rare occasion* to change a rule of law that may have long persisted but also have long been questioned and *only fluctuatingly applied.* To say that everybody on the Court has been wrong for 150 years [75 years] and that that which has been deemed part of the bone and sinew of the law should now be extirpated is quite another thing . . . . *The admonition of Mr. Justice* BRANDEIS *that we are not a third branch of the Legislature should never be disgarded."*\*

In *Brown v. Allen,* 344 U.S. 443 (1953), Mr. Justice JACKSON (in a concurring Opinion on the abuse

---

\* Italics throughout, ours.

of the writ of habeas corpus) aptly and pertinently said (page 535): "Rightly or wrongly, the belief is widely held by the practicing profession that this Court no longer respects impersonal rules of law but is guided in these matters by personal impressions which from time to time may be shared by a majority of Justices. Whatever has been intended, this Court also has generated an impression in much of the judiciary that *regard for precedents and authorities is obsolete,* that *words no longer mean what they have always meant to the profession,* that *the law knows no fixed principles.*"

Mr. Justice Douglas, who is generally regarded as the leading opponent of stare decisis, in an article written for the Columbia Law Review of June 1949, Vol. 49, p. 735, said: "Uniformity and continuity in law are necessary to many activities. If they are not present, the integrity of contracts, wills, conveyances and securities is impaired. *And there will be no equal justice under law if a negligence rule is applied in the morning but not in the afternoon.* Stare decisis provides some moorings so that men may trade and arrange their affairs with confidence. Stare decisis serves to take the capricious element out of law and to give stability to a society. It is a strong tie which the future has to the past."

## Exceptions

It is obvious, if we are to progress, that there always will be exceptions to every general rule or principle, and that neither the law nor the principle of stare decisis can or should be as immutable as the laws of the Medes and the Persians. Nevertheless, it is obvious, at least to me, that the principle of stare decisis should not be ignored or extirpated, actually or effectually, merely or principally because of changes in the personnel of the Court. Mr. Justice Frankfurter has stated the two exceptions which to him seem justifiable. I agree with him, and while I would express the same

thoughts a little differently, I would go further. I would hold that the principle of stare decisis should always be applied, *irrespective of the changing personnel of this (or any Supreme) Court,* except in the two situations set forth by Justice FRANKFURTER and in the following situations: (1) where the Supreme Court of Pennsylvania is convinced that prior decisions of the Court are irreconcilable, or (2) the application of a rule or principle has *undoubtedly* created great confusion, or (3) in those rare cases where the Supreme Court is *convinced* that the *reason* for the law *undoubtedly* no longer exists, *and modern circumstances and justice combine* to require or justify a change, and no one's present personal rights or vested property interests will be injured by the change. Change of circumstances or modern circumstances does not mean, nor has it ever heretofore been considered as the equivalent of "change of personnel in the Court," or the substitution of the social or political or economic philosophy of a Judge for the language of the Constitution or of a written instrument, or for well settled principles of law.

Mr. Justice OWEN J. ROBERTS, Pennsylvania's most illustrious member of the Supreme Court of the United States, in a dissenting Opinion in *Smith v. Allwright,* 321 U.S. 649, 669, thus aptly and strikingly expressed his views concerning the erosion or abolition of the principle of stare decisis: "The reason for my concern is that the instant decision, overruling that announced about nine years ago, tends to bring adjudications of this tribunal into the same class as a *restricted railroad ticket, good for this day and train only.* I have no assurance, in view of current decisions, that the opinion announced today may not shortly be repudiated and overruled by justices who deem they have new light on the subject."

Mr. Justice EAGEN well expressed the same concern for stare decisis in the recent case of *Commonwealth*

*v. Woodhouse,* 401 Pa. 242, 253, 164 A. 2d 98 (1960):
". . . Unquestionably, in a republican form of government as we are privileged to enjoy, order, certainty and stability in the law are essential for the safety and protection of all. Stare Decisis should not be trifled with. *If the law knows no fixed principles, chaos and confusion will certainly follow . . . .* If it is clear that the reason for a law no longer exists and modern circumstances and justice require a change, and no vested rights will be violated, a change should be made."

Chief Justice BLACK and Chief Justice CHARLES ALVIN JONES so aptly expressed the principles which should govern the Courts of Pennsylvania, irrespective of the social or political philosophy of the constantly changing members of the Court, that at the risk of piling Pelion upon Ossa, we shall quote what they so wisely said.

In *Michael v. Hahnemann Medical College and Hospital of Philadelphia,* 404 Pa. 424, Chief Justice JONES, speaking for the Court as recently as June 27, 1961, vigorously urged adherence by Courts to the principle of stare decisis and, inter alia, said: "What Chief Justice BLACK said for this court in McDowell v. Oyer, 21 Pa. 417, 423 (1853), concerning stare decisis, is presently most apposite, viz., 'It is sometimes said that this adherence to precedent is slavish; that it fetters the mind of the judge, and compels him to decide without reference to principle. But let it be remembered that *stare decisis* is itself a principle of great magnitude and importance. *It is absolutely necessary to the formation and permanence of any system of jurisprudence.* Without it we may fairly be said to have no law; for law is a fixed and *established rule,* not depending in the slightest degree *on the caprice* of those who may happen to administer it . . . .' "

We once again repeat the words of Mr. Justice JACKSON: ". . . *this Court has generated an impression*

in much of the judiciary [and of the Bar] *that regard for precedents and authorities is obsolete,* that words no longer mean what they have always meant to the profession, that *the law knows no fixed principles.*" Moreover, the majority fail to realize that when they so frequently change the law and overrule *well-established* principles, they not only make it impossible for every Judge, public official, lawyer and citizen to know what the law is in a particular field and govern his actions accordingly, but they also greatly increase litigation and Court backlogs because of the well-founded belief that our future decision in any matter or on any set of facts is completely unpredictable.

For each and all of the aforesaid reasons, I would affirm the judgment of the lower Court.