454 A.2d 991

**COMMONWEALTH of Pennsylvania**

v.

**George GESCHWENDT, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 27, 1982.

Decided Dec. 31, 1982.

Reargument Denied Feb. 4, 1983.

Stuart Wilder, Asst. Public Defender, for appellant.

Michael J. Kane, Dist. Atty., Stephen B. Harris, First Asst. Dist. Atty., for appellee.

Before O'BRIEN, C.J., and ROBERTS, NIX, LARSEN, FLAHERTY, McDERMOTT and HUTCHINSON, JJ.

## OPINION

NIX, Justice.

Appellant, George Geschwendt, following a jury trial was convicted of murder in the first degree in the killing of 5 members of the Abt family and a family friend.[1] In this appeal he raises a number of objections in support of his request for a new trial. We will focus in this opinion upon the question of whether the holding of this Court in *Commonwealth v. Mulgrew*, 475 Pa. 271, 380 A.2d 349 (1977) is here applicable.[2]

[1] The death sentence was imposed by the jury. That sentence was subsequently changed to life imprisonment in view of our holding in *Commonwealth v. Moody*, 476 Pa. 223, 382 A.2d 442 (1977), *cert. denied*, 438 U.S. 914, 98 S.Ct. 3143, 57 L.Ed.2d 1160 (1978).

[2] Appellant also charges it was error to (a) fail to suppress his confession; (b) to refuse requests for charge on alternative tests of insanity; (c) to admit color photographs of the crime scene; (d) to allow testimony of Dr. Kool and (e) to have denied his request for a change of venue. Appellant also challenged the constitutionality of 17 P.S. § 1333 which exempts attorneys and physicians from jury duty and charges a denial of due process in the restriction of the voir dire. We have carefully reviewed each of these assertions of error and find them devoid of merit.

The facts surrounding the murders were not disputed. Appellant sought to avoid criminal responsibility by reason of insanity at the time of the incident.

George Geschwendt lived across the street from the Abt family. On March 12, 1976, at approximately 8:30 a.m., he broke and entered the Abt residence. Appellant's mother, with whom he lived with a brother, had gone to work. No one was in the Abt home, as all of the members of the Abt family had gone to work or to school. He had a .22 caliber gun and ammunition which he had purchased some time prior to March 12 and falsely reported stolen the day of the purchase. In the process of his illegal entry, glass from the kitchen window was broken. In order to avoid suspicion, he cleaned up the glass and placed himself in the house in a manner that made the kitchen door visible, while simultaneously he was able to observe the living room door to the outside. He patiently laid in wait for approximately six hours; then, consecutively, as five members of the Abt family and a boyfriend entered the house, he shot and killed them one by one. During this carnage, he also killed the family dog.

The bodies of all the victims were pushed or carried into the basement. He also cleaned up the victims' blood. The dead dog was obscured from the sight of anyone who might look through the window of the ground level cellar door, by articles of clothing. He placed all spent shell casings in his pocket. The purpose of these activities which occurred after each shooting was to ensure the inability of successive victims entering the house from being aware of the prior slaughters. When Margie Abt, one of the victims, came home he secreted himself and permitted her to complete a brief telephone conversation before killing her. Although two members of the Abt family had not returned, he left the house because the constant telephone ringing made him cunningly cautious. He returned to his home by a circuitous route, in a deliberate effort to avoid detection. The shootings occurred during a time span between 3:20 p.m. and 6:30 p.m.

Once home, appellant concealed the gun, the rubber gloves he had worn and his bloody clothing in the saddlebags of his motorcycle. He locked the motorcycle in the garage where it was usually kept. The next day, he drove a considerable distance to the Delaware River into which he discarded the shoes and gloves. He washed his pants and other clothing to remove the bloodstains and gave them to the Goodwill Industry. Three days later, March 16, he threw the gun, spent shell casings and the remainder of the live ammunition into the Neshaminy Creek which was nearby. The gun was later recovered by the police from the creek. While the shootings were taking place, he had worn ear protectors.

Approximately a week after the Abt killings, the Bensalem Police asked appellant to come to headquarters for questioning about the alleged theft of his gun. On March 22, he was interviewed and given a polygraph test by police. The polygraph test showed that his answers were deceptive. At 7:45 p.m. the same day, he confessed, once told of the results of the polygraph test, giving a full and detailed description of the killing, together with the events and activities related thereto which had occurred before and after the shootings. After his arraignment that evening, he gave a stenographically recorded confession. He stated to the police that he was sorry he was unable to remain in the Abt house to accomplish his purpose of killing *all* of the members of the family. Two members survived as a result of his early departure.

The first assignment of error is the trial court's refusal to charge the jury, upon request by the defense, as to the consequences of a verdict of not guilty by reason of insanity. This Court originally expressed the view set forth in *Commonwealth v. Gable*, 323 Pa. 449, 187 A. 393 (1936). In *Gable* we summarily rejected the contention as follows:

> The third question involves the proposition that, in a homicide case, where the defense is insanity, the trial judge must state, when requested to do so, that if the verdict is not guilty by reason of insanity, it will be his duty to send the defendant to a state institution for the

insane. With this the jury has nothing to do and it was not error to refuse to so tell them.

*Id.,* 323 Pa. at 453, 187 A. at 395.

The *Gable* view was thereafter the law in this Commonwealth until our decision in *Commonwealth v. Mulgrew,* 475 Pa. 271, 380 A.2d 349 (1977). A unanimous Court in *Mulgrew* reversed the position previously adopted in *Gable* and held "when insanity is raised as a possible defense to criminal charges, a jury must be instructed concerning the possible psychiatric treatment and commitment of the defendant after the return of a verdict of not guilty by reason of insanity." *Commonwealth v. Mulgrew, supra,* 475 Pa. at 277–78, 380 A.2d at 352. In *Mulgrew* we explained that the simplistic view articulated in *Gable,* in that punishment was not the concern of the jury and thus no explanation was required to be given to them, fails to meet the realities of the situation.

If the instant trial had occurred after the filing of our opinion in *Mulgrew,* it is clear that the appellant would have been entitled to the requested point of charge. However, since the trial in this appeal was concluded on July 19, 1976 and the opinion in *Mulgrew* was not filed until December 1, 1977, the trial court's ruling was consistent with the then prevailing statement of the law. Thus, absent a determination that the *Mulgrew* rule should be given retrospective application, the instant assignment of error is without merit.

This issue requires us to wrestle with the most troublesome question of the applicability of a newly articulated pronouncement of state law. *See, e.g., Commonwealth v. Ernst,* 476 Pa. 102, 381 A.2d 1245 (1978) (plurality opinion; Opinion in Support of Affirmance: Pomeroy, J., joined by Eagen, C.J., Nix, J. concurs in result; Opinion in Support of Reversal: Roberts, J. joined by O'Brien, J. and Manderino, J.). Even the terms "prospective" and "retrospective" arc deceiving in their complexities. Although the variations are virtually infinite, the dispute has focused upon four specific options. The first option gives complete prospective effect to the newly pronounced rule. It limits its applicability to

future cases and denies the benefit even to the parties in the litigation in which the principle was first announced. *Commonwealth v. Milliken,* 450 Pa. 310, 300 A.2d 78 (1973). *Accord, Commonwealth v. Minarik,* 493 Pa. 573, 427 A.2d 623 (1981); *Commonwealth v. Gravely,* 486 Pa. 194, 404 A.2d 1296 (1979) (plurality opinion); *Commonwealth v. Tarver,* 467 Pa. 401, 357 A.2d 539 (1976) (opinion announcing decision of the Court); *Commonwealth v. Jones,* 457 Pa. 563, 319 A.2d 142 (1974) (opinion in support of affirmance); *Commonwealth v. Fowler,* 451 Pa. 505, 304 A.2d 124 (1973); *Commonwealth v. Scoleri,* 399 Pa. 110, 160 A.2d 215 (1960) (opinion in support of affirmance). *See, e.g., Morrissey v. Brewer,* 408 U.S. 471, 490, 92 S.Ct. 2593, 2604, 33 L.Ed.2d 484 (1972).

Second, the change may be applied to future litigants, but retrospectively only to the parties at bar. *See, e.g., Michigan v. Payne,* 412 U.S. 47, 93 S.Ct. 1966, 36 L.Ed.2d 736 (1973); *Adams v. Illinois,* 405 U.S. 278, 284–85, 92 S.Ct. 916, 920–921, 31 L.Ed.2d 202 (1972) (plurality opinion); *Stovall v. Denno,* 388 U.S. 293, 301, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967); *DeStefano v. Woods,* 392 U.S. 631, 633, 88 S.Ct. 2093, 2095, 20 L.Ed.2d 1308 (1968); *Johnson v. New Jersey,* 384 U.S. 719, 86 S.Ct. 1772, 16 L.Ed.2d 882 (1966). The third option permits the change to effect all cases still on direct review at the time of the pronouncement. *August v. Stasak,* 492 Pa. 550, 424 A.2d 1328 (1981); *Gibson v. Commonwealth,* 490 Pa. 156, 415 A.2d 80 (1980); *Mayle v. Pa. Dept. of Highways,* 479 Pa. 384, 388 A.2d 709 (1978) applied in *Steinberg v. Commonwealth, Dept. of Public Welfare,* 480 Pa. 321, 389 A.2d 1086 (1978); *Grieser v. Commonwealth, Dept. of Transportation,* 480 Pa. 447, 390 A.2d 1263 (1978); *Tokar v. Commonwealth, Dept. of Transportation,* 480 Pa. 598, 391 A.2d 1046 (1978); *Dubree v. Commonwealth,* 481 Pa. 540, 393 A.2d 293 (1978); *Kenno v. Commonwealth, Dept. of State Police,* 481 Pa. 562, 393 A.2d 304 (1978); *Commonwealth v. Riggins,* 474 Pa. 115, 377 A.2d 140 (1977) applied in *Commonwealth v. Green,* 480 Pa. 446, 390 A.2d 1263 (1978); *Azzarello v. Black Brothers Co.,* 480 Pa. 547, 391 A.2d 1020

(1978); *Kuchinic v. McCrory*, 422 Pa. 620, 222 A.2d 897 (1966). The fourth allows the new principle to effect cases already final at the time that it is adopted.[3]

Initially, it must be recognized that there is no dispute that the federal constitution is neutral on the subject. As the United States Supreme Court stated in *Linkletter v. Walker*, 381 U.S. 618, 629, 85 S.Ct. 1731, 1737, 14 L.Ed.2d 601 (1965) and reaffirmed, *without qualification*, in *United States v. Johnson*, 457 U.S. 537, 542, 102 S.Ct. 2579, 2583, 73 L.Ed.2d 202, 208 (1982), ". . . the Constitution neither prohibits nor requires retrospective effect. . . ." Both *Linkletter* and *Johnson* acknowledged and affirmed the statement made in *Great Northern R.R. Co. v. Sunburst Oil & Refining Co.*, 287 U.S. 358, 364, 53 S.Ct. 145, 148, 77 L.Ed. 360 (1932) that: ". . . the federal constitution has no voice upon the subject. . . ." *United States v. Johnson, supra*, 457 U.S. at 542, 102 S.Ct. at 2583, 73 L.Ed.2d at 208; *Linkletter v. Walker, supra*, 381 U.S. at 625, 85 S.Ct. at 1735. Furthermore, there is nothing in the constitution of this Commonwealth that would dictate a contrary conclusion. We there-

**3.** In this jurisdiction finality has been defined as an order terminating "the litigation between parties to the suit by precluding a party from further action in that court." *Middleberg v. Middleberg*, 427 Pa. 114, 115, 233 A.2d 889, 890 (1967). This comports with the federal definition:

> [i]n general, a 'judgment' or 'decision' is final for the purpose of appeal only 'when it terminates the litigation between the parties on the merits of the case, and leaves nothing to be done but to enforce by execution what has been determined.' *Parr v. United States*, 351 U.S. 513, 518, 76 S.Ct. 912, 916, 100 L.Ed. 1377, 1383 (1956).

Under the Post Conviction Hearing Act, 19 Pa.C.S.A. § 1180-1, *et seq.*, "finally litigated" is defined as follows:

When an issue is finally litigated . . .

> (a) For the purpose of this act, an issue is finally litigated if:
> (1) It has been raised in the trial court, the trial court has ruled on the merits of the issue, and the petitioner has knowingly and understandingly failed to appeal the trial court's ruling; or
> (2) The Superior Court of the Commonwealth of Pennsylvania has ruled on the merits of the issue and the petitioner has knowingly and understandingly failed to avail himself of further appeals; or
> (3) The Supreme Court of the Commonwealth of Pennsylvania has ruled on the merits of the issue.

19 Pa.C.S.A. § 1180-4.

128

fore can begin the inquiry upon the established premise that neither the federal nor our state constitution compels the result we reach.

■ An equally important indisputable fact that must be recognized at this juncture is that the deliberations of the United States Supreme Court upon this subject, while informative and worthy of close assessment, are not controlling insofar as our determinations as to the applicability to be given to changes in state law which we deem advisable. *Great Northern R.R. Co. v. Sunburst Oil & Refining, supra.* Certainly, where the change is deemed to be compelled by federal constitutional precept, we must anticipate the United States Supreme Court's view as to the appropriate effect to be given to the new pronouncement. Where, as here, we are dealing with matters of purely state law, it is within our province, subject of course to the proper exercise of the powers vested in this Court, to fashion a scheme most efficacious for this jurisdiction. Thus, as we consider the various views expressed by the members of the United States Supreme Court on the subject, we do so to seek to gain the benefit of their experience in the area and to profit from the wisdom of their reflective judgment on the topic. Fortified by that insight and the experience of this Court in this turbulent area, we proceed to seek a resolution of the problem.

■ There appears to be little support for a rule that would limit changes in state law only to future litigants and deny its benefits to the party in the proceeding in which the change is first announced. The concern with such a position is that it would stifle the initiative which is essential to a progressive, dynamic development of a system of justice. This is particularly true in the criminal law area. Whereas the resources are available in the civil area, particularly in commercial matters, to institute and pursue a matter to establish new law without expectation of benefit in that lawsuit, such is not the case of the individual defendant who is seeking relief for what is perceived by him to be a personal wrong or injustice. His concern is not the future of

the law but rather its present application to him. Thus, it is relatively simple to conclude that in the criminal law area, at least, we must permit the litigant in the matter wherein the new principle is first announced to enjoy the benefit of the change afforded.[4]

It is also generally agreed that a rule which would routinely require the disturbance of settled matters would deter legitimate attempts to improve our system. Where the change is designed merely to embellish and reinforce the integrity of the process, the turmoil which would accompany a mandatory concept of a complete retrospective approach in finally litigated matters would erode the public's inherent respect for the stability of justice. It would also tend to discourage the adoption of new approaches for fear of the impact that would result from the change.

The vortex of the storm of controversy surrounds the question of whether the new rule should be applied to all cases on direct review at the time of the change. The basic argument in support of this view of limited retrospectivity was succinctly stated by Mr. Justice Harlan as follows:

> ... a proper perception of our duties as a court of law, charged with applying the Constitution to resolve every legal dispute within our jurisdiction on direct review, mandates that we apply the law as it is at the time, not as it once was.
>
> *Mackey v. United States*, 401 U.S. 667, 681 [, 91 S.Ct. 1160, 1175, 28 L.Ed.2d 404] (1971) (Harlan, J., concurring and dissenting).

This argument is merely a restatement of the concept expressed by Chief Justice Marshall in *United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

> But if, subsequent to the judgment, and before the decision of the appellate court a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied.... In such a case the court

4. Such a rule also provides the flexibility to the reviewing court to select the case most appropriate in which to announce the change.

must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside.

A tenuous majority in *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982) has appeared to adopt the Harlan view with respect to retrospective application to convictions not final at the time the decision was rendered. However, there are two significant limitations in the *Johnson* position most pertinent to our present inquiry. First, the view of the *Johnson* majority affording retrospective application to matters then on direct appeal related to decisions that were *constitutionally compelled,* specifically in that case Fourth Amendment violations. *United States v. Johnson, supra.* Here we are concerned with merely a change in state practice; there was no constitutional overtones in our decision to set aside the *Gable* view, but rather our decision in *Mulgrew* represented an exercise of our supervisory authority. The argument of the necessity of decision-making consistency in the application of constitutionally compelled decisions loses its force when removed from the constitutional setting.

Second, even where the decision was constitutionally mandated, the *Johnson* majority concluded that where the new rule represents "a clear break with the past," nonretroactive application is indicated.[5] *United States v. Johnson, supra.*

Conversely, where the Court has expressly declared a rule of criminal procedure to be "a clear break with the

5. That court defined the phrase, "clear break with the past," as follows:

In general, the Court has not subsequently read a decision to work a "sharp break in the web of the law," . . . unless that ruling caused "such an abrupt and fundamental shift in doctrine as to constitute an entirely new rule which in effect replaced an older one," . . . . Such a break has been recognized only when a decision explicitly overrules a past precedent of this Court, . . . or disapproves a practice this Court arguably has sanctioned in prior cases, . . . or overturns a longstanding and widespread practice to which this Court has not spoken, but which a near-unanimous body of lower court authority has expressly approved. 457 U.S. at 551, 102 S.Ct. at 2588, 73 L.Ed.2d at 215.

past," *Desist v. United States,* 394 U.S., [244] at 248, 22 L.Ed.2d [244] 248, 89 S.Ct. 1030 [, 1032], it almost invariably has gone on to find such a newly-minted principle nonretroactive. See *United States v. Peltier,* 422 U.S. 531, 547, n. 5, 45 L.Ed.2d 374, 95 S.Ct. 2313 [, 2322] (1975) (Brennan, J., dissenting) (collecting cases). In this second type of case, the traits of the particular constitutional rule have been less critical than the Court's express threshold determination that the " 'new' constitutional interpretio[n] . . . so change[s] the law that prospectivity is arguably the proper course," *Williams v. United States,* 401 U.S., [646] at 659, 28 L.Ed.2d 388, 91 S.Ct. 1148 [, 1155] (plurality opinion). Once the Court has found that the new rule was unanticipated, the second and third Stovall factors—reliance by law enforcement authorities on the old standards and effect on the administration of justice of a retroactive application of the new rule—have virtually compelled a finding of nonretroactivity. See, e.g., *Gosa v. Mayden,* 413 U.S., [665] at 672–673, 682–685, 37 L.Ed.2d 873, 93 S.Ct. 2926 [, 2932–2933, 2937–2938] (plurality opinion); *Michigan v. Payne,* 412 U.S. [47] at 55–57, 36 L.Ed.2d 736, 93 S.Ct. 1966 [, 1970–1971]. [Footnote omitted.]

457 U.S. at 549–50, 102 S.Ct. at 2587–2588, 73 L.Ed.2d at 213–214.

Following the *Johnson* majority's rationale, even if *Mulgrew* had been constitutionally compelled, which it was not, we would reach the conclusion here that a prospective application would be appropriate since the change in the rule in question is the clearest possible example of "a clear break with the past."

A decision of prospective application of *Mulgrew* would be also consistent with the dissenting view expressed in *Johnson,* 457 U.S. at 564, 102 S.Ct. at 2595, 73 L.Ed.2d at 223. In a strong dissent, four of the members of the Supreme Court urged that retroactive application was required only where the major purpose of the rule change was "to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so raises serious questions about

the accuracy of guilty verdicts in past trials." *United States v. Johnson, supra* at 564, 102 S.Ct. at 2595, 73 L.Ed.2d at 223. *Mulgrew* was not a change fashioned to correct a serious flaw in the fact-finding process but rather represented a refinement in our practice. While the change is expected to enhance the process, its prospective application would not reflect an erosion of our commitment to provide a fair trial.

Once we fully appreciate the unsoundness of the declaratory theory of Blackstone,[6] and accept that wrongly decided cases were nonetheless existing judicial facts until overruled, the focus of the question of retrospective application is placed in proper focus. Accepting the constant evolutionary development of the law,[7] we must reject ironclad rules of

**6.** Blackstone expressed the view that the court's role was not to "pronounce a new law, but to maintain and expand the old one." Blackstone, Commentaries 69 (15th ed. 1809). Proceeding from this premise, discarded principles were viewed as aberrations which could not be given any effect nor even its existence recognized. *See, e.g., Kuhn v. Fairmount Coal Co.,* 215 U.S. 349, 372, 30 S.Ct. 140, 148, 54 L.Ed. 228 (Holmes, J., dissenting).

**7.** *See e.g., Kaczkowski v. Bolubasz,* 491 Pa. 561, 421 A.2d 1027 (1980) (eliminated practice of discounting future lost earnings in wrongful death and survival actions in order to reflect impact of inflation); *Soffer v. Beech,* 487 Pa. 255, 409 A.2d 337 (1979) (abandoned common law rule that actual possession is prerequisite to action in ejectment); *Estate of Grossman,* 486 Pa. 460, 406 A.2d 726, 733 (1979) (abandoned per se rule disqualifying testimony of the spouse of a surviving interested party to a transaction with a decedent); *Mayle v. Pennsylvania Dept. of Highways,* 479 Pa. 384, 388 A.2d 709 (1978) (abrogated sovereign immunity); *Fadgen v. Lenkner,* 469 Pa. 272, 365 A.2d 147 (1976) (abolished civil cause of action based upon tort of criminal conversation); *Ayala v. Philadelphia Board of Public Education,* 453 Pa. 584, 305 A.2d 877 (1973) (abrogated local governmental immunity); *Commonwealth v. McCusker,* 448 Pa. 382, 292 A.2d 286 (1972) (rejected rule that psychiatric evidence is inadmissible in murder prosecution for purposes of determining whether defendant acted in heat of passion); *Commonwealth v. Archambault,* 448 Pa. 90, 290 A.2d 72 (1972) (rejected prior cases concerning scope of permissible remarks by a judge to jury); *Falco v. Pados,* 444 Pa. 372, 282 A.2d 351 (1971) (abrogated parental immunity); *Conestoga National Bank v. Patterson,* 442 Pa. 289, 275 A.2d 6 (1971) (reversed prior rule regarding procedure afforded protesting banks in branch bank application situations); *Smalich v. Westfall,* 440 Pa. 409, 269 A.2d 476 (1970) (rejected prior rule imputing contributory negligence of driver to owner-passenger); *Papieves v. Kelly,* 437 Pa. 373, 263 A.2d 118 (1970) (recovery permitted

retrospective application based upon outdated fictions and be guided by an examination of the history, purpose, and effect of the new rule, as well as the inequity and disruption that would be imposed by its retroactive application. *See Chevron Oil Co. v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971).

In this context, it should be noted that one of the arguments frequently advanced for retrospective application on direct appeal is that even-handed justice requires the application of the new rule to litigants similarly situated. *Hankerson v. North Carolina,* 432 U.S. 233, 246–247, 97 S.Ct. 2339, 2346–2347, 53 L.Ed.2d 306 (1977) (Powell, J., concurring in the judgment); *United States v. Peltier,* 422 U.S. 531, 543, 95 S.Ct. 2313, 2320, 45 L.Ed.2d 374 (1975) (Douglas, J., dissenting); *Mackey v. United States,* 401 U.S. 667, 675, 91 S.Ct. 1160, 1164, 28 L.Ed.2d 404 (1971) (Harlan, J., separate opinion); *Desist v. United States,* 394 U.S. 244, 256, 89 S.Ct. 1030, 1037, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting); *Commonwealth v. Hill,* 492 Pa. 100, 115, 422 A.2d 491, 499 (1980) (Opinion in Support of Reversal); *Commonwealth v. Ernst,* 476 Pa. 102, 111, 381 A.2d 1245, 1249 (1978) (Opinion in Support of Reversal).

for emotional distress resulting from intentional or wanton misconduct); *Reitmeyer v. Sprecher,* 431 Pa. 284, 243 A.2d 395 (1968) (rejected prior limitation on a landlord's liability for defective conditions); *Kassab v. Central Soya,* 432 Pa. 217, 246 A.2d 848 (1968) (eliminated vertical privity requirement); *Restifo v. McDonald,* 426 Pa. 5, 230 A.2d 199 (1967) (effect of release of third-party action); *Beckham v. Travelers Ins. Co.,* 424 Pa. 107, 225 A.2d 532 (1967) (abandoned distinction between accidental means and accidental results); *Webb v. Zern,* 422 Pa. 424, 220 A.2d 853 (1966) (adopted Restatement, Second, Torts § 402A); *Flagiello v. Pennsylvania Hospital,* 417 Pa. 486, 208 A.2d 193 (1965) (abrogated charitable immunity); *Griffith v. United Air Lines,* 416 Pa. 1, 203 A.2d 796 (1964) (rejected lex loci rule of conflicts of law); *Olin Mathieson C. Corp. v. White C. Stores,* 414 Pa. 95, 199 A.2d 266 (1964) (Pennsylvania Fair Trade Act unconstitutional); *Campbell v. Fiorot,* 411 Pa. 157, 191 A.2d 657 (1963) (repudiated prior rule regarding evidence of skidding car); *Catherwood Trust,* 405 Pa. 61, 173 A.2d 86 (1961) (abolished Pennsylvania Rule of Apportionment); *Sinkler v. Kneale,* 401 Pa. 267, 164 A.2d 93 (1960) (rejected prior case law which held infant does not have a cause of action for prenatal injuries); *Commonwealth v. Redline,* 391 Pa. 486, 137 A.2d 472 (1958) (changed felony murder rule).

134

> [W]hen another similarly situated defendant comes before us, we must grant the same relief or give a principled reason for acting differently. We depart from this basic judicial tradition when we simply pick and choose from among similarly situated defendants those who alone will receive the benefit of a 'new' rule of constitutional law. *Desist v. United States,* 394 U.S. 244, 258–259, 89 S.Ct. 1030, 1038–1039, 22 L.Ed.2d 248 (1969) (Harlan, J., dissenting).

The "even handed justice" argument myopically considers only the interest of the disappointed litigant and ignores our responsibility to provide a fair system of justice for all of the citizens of this Commonwealth. The litigant's interest in securing the benefit of the change must be considered in conjunction with the purposes intended to be accomplished by the change and the impact of a retrospective application upon the system. Such a balancing approach is essential in ensuring true fairness not only to the litigant, but also to society as a whole.

Appellant suggests that our decision in *Commonwealth v. Brown,* 494 Pa. 380, 431 A.2d 905 (1981) forecloses further consideration of this question. It is true that the language of the opinion of Mr. Justice Roberts in that case speaks in terms of a retrospective application in *Mulgrew* in justification of affording relief to Mr. Brown. However, the facts of the case justified the result reached without requiring a retrospective application of *Mulgrew,* 494 Pa. at 386, 431 A.2d at 908 (1981) (Nix, J., concurring).

In *Brown* during summation, the prosecuting attorney deliberately attempted to suggest to the jury that a finding of not guilty by reason of insanity would insure the immediate freedom of the defendant. This intentional distortion by the prosecution justified the result reached in *Brown* without a consideration of the question of the retrospective application of *Mulgrew.* *Commonwealth v. Revty,* 448 Pa. 512, 295 A.2d 300 (1972). We now disavow the stated holding in that decision embracing a *per se* application of the *Schooner Peggy* doctrine.

Finally, appellant suggests that we may not be here faced with a question of retroactivity since the present case was tried after the trial in *Mulgrew.* This ingenious argument ignores that the operative fact is not when the trial occurred in *Mulgrew,* but rather when the new rule was first articulated. At the time of the trial in *Mulgrew,* as well as the instant trial, the *Gable* rule represented the last pronouncement of this Court on the subject and the trial judges in both cases had no alternative but to follow it. Therefore, appellant can prevail only in the event that we now determine he is to be given the benefit of the new rule. Restated, the question presented is indeed whether the *Mulgrew* rule should be given retrospective application.

 From the foregoing, we conclude that the nature of the rule announced in *Mulgrew* and the purposes sought to be achieved by its adoption represents a clear break with our former law and, when balanced with the impact of a retrospective application upon the system, is appropriately treated as a prospective principle applying to those cases where the trial ruling occurred after the filing of the *Mulgrew* decision. Since Mr. Geschwendt's trial preceded the filing of our decision in *Mulgrew,* the trial court's refusal to give the requested instructions will not serve as a basis for disturbing the judgment of conviction in this case.[8]

Accordingly, the judgments of sentence are affirmed.

LARSEN, J., concurred in the result.

ROBERTS, J., filed a dissenting opinion in which O'BRIEN, C.J., and FLAHERTY, J., joined.

8. In response to the dissent of Mr. Justice Roberts, it needs only to be clarified that appellant in this appeal has not questioned the court's failure to fully set forth for the jury the alternative verdicts. At no point in his argument does the appellant in any way intimate that the jury was not fully aware of the alternative verdict of not guilty by reason of insanity. His complaint is most specific in his challenge to the refusal of the court to explain the consequences of a verdict of not guilty by reason of insanity. Thus, the dissent addresses an issue which is not before the Court nor is it supported by the record when the charge is viewed as a whole.

ROBERTS, Justice, dissenting.

I dissent.

## I

This case does not in any respect depend, as asserted by the opinion announcing the judgment of the Court, upon application of the Court's decisions in *Commonwealth v. Brown,* 494 Pa. 380, 431 A.2d 905 (1981), and *Commonwealth v. Mulgrew,* 475 Pa. 271, 380 A.2d 349 (1977). Rather, this case is governed by law which has existed in our Commonwealth for more than a century. By focusing exclusively upon the trial court's refusal to explain the consequences of a verdict of not guilty by reason of insanity, as occurred in *Brown* and *Mulgrew,* the opinion announcing the judgment of the Court ignores the critical fact that here the court's refusal was premised upon its simultaneous, erroneous refusal to honor the fundamental request of appellant that the jury be instructed "regarding the specific alternative possibility of a verdict of not guilty by reason of insanity." [1] Because appellant's sanity was a central issue, upon which substantial evidence was offered by both the defense and prosecution, appellant was statutorily entitled to an instruction that would have informed the jury of its right to return a verdict of not guilty by reason of insanity.

In its charge to the jury, the trial court instructed only that the jury should return a verdict of either guilty or not guilty:

"If you return a verdict of guilty, we will assume it is as to all of the six informations. If you return a verdict of not guilty, we will likewise assume that it applies to all of the six informations. For that reason, if you would conclude, based upon such facts as you accept to be credible, that the defendant is guilty of some of the deaths that occurred but not guilty as to others, we expect you to so specify in the verdict if, in fact, you render one.

1. N.T. at 672–73 (Appellant's exceptions to the charge).

I would suggest that the verdict be returned in the form of the foreperson saying words to the effect that, 'We, the members of the jury, find the defendant not guilty,' or, 'We, the members of the jury, find the defendant guilty,' and if so, then go on and say, 'And fix the degree of murder at murder of the first degree, murder in the third degree or voluntary manslaughter.'

I would further suggest that whoever is the foreperson, that he or she write the verdict down before entering the courtroom so that he or she can read it when asked and called upon to give your verdict.

\* \* \* \* \* \*

If the Commonwealth has sustained its burden of proof as I have outlined it for you, do not for one moment be fearful to return a verdict of guilty in such degree as you determine the Commonwealth has demonstrated to you. If, on the other hand, the Commonwealth has not sustained its burden of proof, then it is your duty to render a verdict of not guilty and you should not be fearful of doing so."

N.T. at 669–70, 672. Following these instructions, this colloquy ensued:

"[THE COURT:] Aside from the Points for Charge, are there any additional matters that counsel would have me refer to, clear up or add to at this point?

MR. FINK [ (defense counsel) ]: Yes, sir.

THE COURT: Come to side-bar.

---

(Discussion at side-bar, as follows:)

MR. FINK: I take exception to your failure to charge that sanity is an element of the offenses you mentioned.

THE COURT: So noted.

MR. FINK: I would take exception to Your Honor's second failure to charge regarding the specific alternative possibility of a verdict of not guilty by reason of insanity in accordance with 19 Purdon's 1351 which, I believe,

requires the instruction be given to the jury—the option be given to the jury, unless I misread it.

THE COURT: I do not follow you at all on that.

MR. FINK: It's my feeling they should be specifically instructed there is an alternative not guilty verdict which specifically states not guilty by reason of insanity. I believe that's what that statute says.

THE COURT: An exception is granted."

N.T. at 672–73.[2]

In denying appellant's requested instruction that the jury be informed that there existed three alternative verdicts—(1) guilty, (2) not guilty, and (3) not guilty by reason of insanity—the court failed to follow the Mental Health and Mental Retardation Act of 1966, 50 P.S. § 4413(a), which provides:

"Whenever any person charged with any crime is acquitted on the ground of insanity or having been insane at the time he committed the crime, the jury or the court as the case may be, shall state such reason for acquittal in its verdict."

This provision essentially reenacted the Act of March 31, 1860, P.L. 427, § 66, as amended, 19 P.S. § 1351, which provided:

"In every case in which it shall be given in evidence upon the trial of any person charged with any crime or misdemeanor, that such person was insane at the time of the commission of such offence, and he shall be acquitted,

---

**2.** In addition to the exception noted at trial, appellant requested the following points for charge which were refused:

"2. If George Geschwendt, at the time he committed the acts, either did not know the nature and quality of his acts or did not know that they were wrong, you are instructed to return a verdict of not guilty by reason of insanity."

"11. If you, members of the jury, possess a reasonable doubt as to the sanity of George Geschwendt at the time of the commission of the offenses presently on trial, you shall return a verdict of not guilty by reason of insanity. Upon the return of such a verdict, the court has the power to order him to be kept in strict custody, in such place and such manner as shall seem fit, so long as he shall continue to be of unsound mind."

N.T. at 676, 679–80.

the jury shall be required to find specially whether such person was insane at the time of the commission of such offence, and to declare whether he was acquitted by them on the ground of such insanity; and if they shall so find and declare, the court before whom the trial is had shall order the cost of prosecution to be paid by the county, and shall have power to order him to be kept in strict custody, in such place and in such manner as to the said court shall seem fit, at the expense of the county in which the trial is had, so long as such person shall continue to be of unsound mind." [3]

The prejudicial effect on the truth-determining process of the court's disregard of this legislative directive is manifest. As appellant has stated in addressing the trial court's error, "[c]ertainly if the jury was not informed of this permissible verdict, a full and informed decision could not be made. This is so because consideration would only be given to two of three permissible verdicts." [4]

This Court is obliged to address the trial court's error in refusing to comply with the statutory mandate that has existed since 1860. That error requires the reversal of the order of the Superior Court and the grant of a new trial.

## II

Not only is the extended discussion of the retrospective application of *Commonwealth v. Mulgrew* contained in the opinion announcing the judgment of the Court unresponsive to the prejudicial error established on the record and unnecessary to the proper resolution of the case, but it also propounds a theory of retrospectivity that has no sound basis

3. The Act of 1860 was repealed by the Legislature in the Judiciary Act Repealer Act, Act of April 28, 1978, P.L. 202, § 2(a)[377], 42 P.S. § 20002(a)[377] (Supp.1982), and replaced by 42 Pa.C.S. § 1722(a)(1).

4. Appellant's Brief at 26. Remarkably, the opinion announcing the judgment of the Court has totally ignored appellant's brief, which, as the above quotation illustrates, makes it clear that appellant has raised this argument on appeal, as he did at trial and in post-verdict motions.

for application. Under the guise of proposing a "scheme most efficacious for this jurisdiction" for determining the retrospectivity of changes in "matters of purely state law," the opinion propounds the very sort of "ambulatory retroactivity doctrine" that has recently been rejected by the Supreme Court of the United States for matters of federal constitutional law. See *United States v. Johnson,* 457 U.S. 537, 102 S.Ct. 2579, 73 L.Ed.2d 202 (1982). The opinion announcing the judgment of the Court suggests that this Court should "be guided by an examination of the history, purpose, and effect of the new rule, as well as the inequity and disruption that would be imposed by its retroactive application." Yet the opinion's limited analysis of the decision in *Commonwealth v. Mulgrew* demonstrates that the opinion has done little more than summarily conclude that appellant should be denied the right to the application of existing law simply because that law was established in a case other than appellant's after appellant had unsuccessfully requested similar treatment at trial.[5]

In rejecting an "ambulatory" approach to retrospectivity, which gives little guidance either to courts or to litigants, the Supreme Court of the United States has stated:

"The problem is not merely the *appearance* of inequity, but the *actual inequity* that results when the Court chooses which of many similarly situated defendants should be the chance beneficiary of a retroactively-applied rule. As the persistently-voiced dissatisfaction with the Court's 'ambulatory retroactivity doctrine' has revealed, until now this Court has not 'resolved' this problem so much as it has chosen to tolerate it. The time for toleration has come to an end."

*United States v. Johnson,* supra, 457 U.S. at 555 n. 16, 102 S.Ct. at 2591 n. 16 (1982) (emphasis in original) (citation

5. Appellant's post-verdict motions were pending at the time of this Court's decision in *Mulgrew.* These motions included a claim that the court had erred in denying appellant's request for a jury instruction explaining the consequences of a verdict of not guilty by reason of insanity.

omitted).[6] In propounding the very theory of retrospectivity which has been demonstrated by case law to be inadequate, the opinion announcing the judgment of the Court has obviously ignored the recent admonition of Mr. Justice Nix, who, in a related context, wrote for the Court: "In such an instance it is fair to conclude that all of those litigants were in the same situation and the outcome of their lawsuit should not depend on a race to the courthouse." *Commonwealth v. Hernandez*, 498 Pa. 405, 411, 446 A.2d 1268, 1271 (1982).

On this record, none of the considerations deemed relevant by the opinion announcing the judgment of the Court to ensure "true fairness" supports its result. Even-handed justice of course requires that the same law be applied to appellant that has been applied on direct appeal to at least three other similarly situated defendants.[7] So, too, the application of existing law is required by "the purposes intended to be accomplished by the change [effectuated in *Mulgrew*]." Contrary to the assertion of the opinion announcing the judgment of the Court, the decision in *Mulgrew* was clearly more than "a refinement in our practice"; it was designed "to overcome an aspect of the criminal trial that substantially impairs its truth-finding function and so

**6.** The Supreme Court's decision in *United States v. Johnson* to exercise its "power to eliminate the obvious unfairness that results when it gives only the most conveniently situated defendant the retrospective benefit of a newly-declared rule," 457 U.S. at 556 n. 17, 102 S.Ct. at 2579 n. 17, comports with the common-law rule first articulated by the Supreme Court of the United States in 1801:

"[I]f, subsequent to the judgment and before the decision of the appellate court a law intervenes and positively changes the rule which governs, the law must be obeyed, or its obligation denied .... In such a case the court must decide according to existing laws, and if it be necessary to set aside a judgment, rightful when rendered, but which cannot be affirmed but in violation of law, the judgment must be set aside."

*United States v. Schooner Peggy*, 5 U.S. (1 Cranch) 103, 110, 2 L.Ed. 49 (1801).

**7.** See *Commonwealth v. Brown*, 494 Pa. 380, 431 A.2d 905 (1981); *Commonwealth v. Mulgrew*, 475 Pa. 271, 380 A.2d 349 (1977); *Commonwealth v. Hastings*, 301 Pa.Super. 65, 446 A.2d 1337 (1982), allocatur denied, October 8, 1982.

raises serious questions about the accuracy of guilty verdicts in past trials." *Williams v. United States,* 401 U.S. 646, 653, 91 S.Ct. 1148, 1152, 28 L.Ed.2d 388 (1971). In holding that a court must instruct the jury concerning the consequences of a verdict of not guilty by reason of insanity, this Court unanimously stated:

> "[E]xplaining the consequences of acquittal by reason of insanity to a jury will assist the jury in properly determining the guilt or innocence of a defendant. By such an instruction we reduce the possibility of compromise verdicts of guilty occasioned by a jury's misapprehension of 'acquitting' a defendant by reason of insanity."

*Commonwealth v. Mulgrew,* 475 Pa. 271, 276, 380 A.2d 349, 352 (1977). Where, as here, a change in law has been designed "to overcome an aspect of the criminal trial that substantially impairs its truth-finding function," the Supreme Court of the United States has consistently applied the new rule to all convictions, such as appellant's, that are not yet final at the time of the change in law. "Neither good-faith reliance by state or federal authorities on prior constitutional law or accepted practice, nor severe impact on the administration of justice has sufficed to require prospective application in these circumstances." *Williams v. United States,* supra, 401 U.S. at 653, 91 S.Ct. at 1152 (citing cases). See *United States v. Johnson,* supra (majority and dissenting opinions); *Hankerson v. North Carolina,* 432 U.S. 233, 97 S.Ct. 2339, 53 L.Ed.2d 306 (1977); *Ivan V. v. City of New York,* 407 U.S. 203, 92 S.Ct. 1951, 32 L.Ed.2d 659 (1972).

Nor can it be said that the retrospective application of *Mulgrew* to convictions not yet final will have an adverse "impact upon the system." The number of cases in which the defense of insanity is raised is small; even smaller is the number of such cases which were pending on direct review at the time of this Court's decision in *Mulgrew.* More important, the decision in *Mulgrew* governs conduct at trial which, unlike pre-trial conduct by law enforcement authorities, can be undone by remanding for a new trial. Although

the retrospective application of *Mulgrew* requires two trials instead of one, it in no respect unduly disturbs reliance on a pre-existing standard.[8]

The ad hoc "balancing approach" suggested by the opinion announcing the judgment of the Court would serve only to invite uncertainty and, consequently, litigation concerning the retrospective application of decisions of this Court. As the Supreme Court of the United States recognized in *United States v. Johnson,* this approach does not advance, but only impedes, the fair administration of justice.

Only by a uniform application of existing law to all convictions not yet final can fairness to the defendant and society be achieved. As this Court stated in *Commonwealth v. Brown,*

"Certainly fairness demands that relief be granted not only in the first case which successfully contests a rule of law but also in all other cases pending on direct appeal which suffer from the same infirmity. To do otherwise in criminal proceedings is to impose an unwarranted hardship on defendants which affects their most fundamental rights of life and liberty, while serving no legitimate societal interest in applying an offensive law no longer valid. Cf. *August v. Stasak,* [492 Pa. 550, 424 A.2d 1328 (1981)] (in civil case, hardship to litigant held to require application of law as it exists at time of appellate review)."

---

**8.** Indeed, at the time of trial, the court was not compelled to deny appellant's request for an appropriate instruction on the consequences of a verdict of not guilty by reason of insanity. Although *Commonwealth v. Gable,* 323 Pa. 449, 187 A. 393 (1936), had held that a court's refusal to give such an instruction was not reversible error, *Gable* did not preclude a court from giving such an instruction. Thus, contrary to the opinion announcing the judgment of the Court, it cannot fairly be said that the trial court had "no alternative but to follow [*Gable*]."

It is, of course, evident that the opinion's characterization of *Commonwealth v. Mulgrew* as "the clearest possible example of 'a clear break with the past' " is at odds with the opinion's characterization of *Mulgrew* as merely "a refinement in our practice."

144

494 Pa. at 385–86, 431 A.2d at 908. Like the appellants in the cases of *Mulgrew, Brown,* and *Hastings,* appellant is entitled to a new trial.

O'BRIEN, C.J., and FLAHERTY, J., join in this dissenting opinion.