

2000 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-6-2000

# Bowersox Truck Sales v. Harco National

Precedential or Non-Precedential:

Docket 98-7504

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2000

Recommended Citation

"Bowersox Truck Sales v. Harco National" (2000). *2000 Decisions.* Paper 72.
http://digitalcommons.law.villanova.edu/thirdcircuit_2000/72

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2000 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed April 6, 2000

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-7504

BOWERSOX TRUCK SALES AND SERVICE, INC.,
        Appellant

v.

HARCO NATIONAL INSURANCE COMPANY

On appeal from the United States District Court
for the Middle District of Pennsylvania
D.C. Civil No. 97-cv-01874
District Judge: Hon. James F. McClure, Jr.

Argued: June 2, 1999

Before: Scirica, McKee, Circuit Judges, and
Schwarzer, District Judge*

(Filed: April 6, 2000)

        Jonathan H. Rudd, Esquire (Argued)
        McNees, Wallace & Nurick
        100 Pine Street
        P.O. Box 1166
        Harrisburg, PA 17108-1166

         Attorney for Appellant

---

* The Honorable William W Schwarzer, United States District Court for
the Northern District of California, sitting by designation.

        Todd B. Narvol, Esquire (Argued)
        Thomas, Thomas & Hafer
        305 North Front Street
        P.O. Box 999
        Harrisburg, PA 17108

         Attorney for Appellee

OPINION OF THE COURT

McKEE, Circuit Judge.

Bowersox Truck Sales & Service, Inc. ("BTS") appeals the

district court's grant of summary judgment in favor of Harco National Insurance Company on BTS's claim for breach of contract and bad faith arising under an insurance policy Harco had issued to BTS. For the reasons that follow, we will reverse, and remand for proceedings consistent with this opinion.

I.

Harco issued a policy of commercial property insurance to BTS by which Harco insured business property of BTS. The insurance included coverage for interruption of BTS's business resulting from damage to the insured property. The policy included business interruption insurance. The policy stated, "No one may bring a legal action .. . under this Coverage Part unless: . . . [t]he action is brought within 2 years after the date on which the direct physical loss or damage occurred." App. at 19a.

On March 4-5, 1994, the weight of accumulated ice and snow on the roof of the insured building caused that building to partially collapse. BTS attempted to shore up the property, and then submitted an insurance claim to Harco. In response, on October 25, 1994, Harco issued four checks totaling $169,610.66. App. at 205a-206a. That sum included an advance in the amount of $19,500 under the Business Interruption and Extra Expense portion of the policy. Harco purportedly advanced that sum in the belief that the building could be repaired. Harco calculated the

2

amount of BTS's loss under the Business Interruption coverage based upon Harco's assumption that BTS would lose $4,000/week for three weeks, and would also have to rent another building during those three weeks at a cost of $2,500/week. However, BTS and Harco failed to agree on whether the building could be repaired, or the cost of repair if repair was possible. BTS eventually concluded that the building had to be replaced, and it sued Harco in 1994 to recover replacement costs of the building. In that suit, BTS also sought a declaratory judgment that it was entitled to recover the actual loss of the business income suffered while the building was being replaced.

On August 31, 1995, Harco and BTS formally agreed to settle BTS's claim for the replacement cost of the building. In return for payment of $250,000 from Harco, BTS and Harco entered into a settlement agreement that was affirmed by the district court. That agreement provided in pertinent part as follows:

     FOR AND IN CONSIDERATION of the payment to

> [Bowersox] of the sum of ONE HUNDRED TWENTY-
> NINE THOUSAND THREE HUNDRED SIXTY-NINE
> DOLLARS and THIRTY-FOUR CENTS ($129,369.34),
> . . . we . . . release . . . Harco National Insurance
> Company . . . of and from any and all past, present
> and future actions. . . including claims or suits based
> upon negligence, breach of contract, bad faith, and any
> claims (except for business interruption as described
> below) seeking recovery for any sums of money under
> Commercial Property Insurance Policy No. CFR 00 10
> 95-08 . . . for all damages (except for business
> interruption as described below) to property belonging
> to and owned by Bowersox.

App. at 54a-56a. However, the settlement agreement specifically reserved BTS's right to pursue any claim it may have under the business interruption coverage as follows:

> It is hereby stipulated and agreed that this Settlement
> and Release shall apply to all claims except for
> business interruption damages as described below,
> resulting from the aforementioned accumulation of
> snow and ice affecting the building, including its

> attached office. . . . The present payment . . . in
> addition to two payments already made by Harco to
> Bowersox . . . is intended to finally settle any and all
> claims Bowersox may have against Harco except as
> related to business interruption as described as
> follows. Nothing in this Release shall prevent Bowersox
> from submitting a claim to Harco and otherwise
> pursuing that claim for business interruption and extra
> expense under [the policy] pursuant to the language of
> the "Business Income Coverage Form (and Extra
> Expense)" as provided in that policy. The parties
> expressly recognize that Harco continues to insure
> Bowersox and this Release is not intended to effect[sic]
> Bowersox's right to make claim under its current or
> any future policy with Harco for future loss or damage
> covered by such policies. . . .

App. at 56a (emphasis added). The agreement also contained the following language regarding BTS's right to subsequently bring a claim against Harco for the latter's bad faith:

> [W]e the Releasors do further release Harco from any
> and all claims that we may have for the manner in
> which all claims under the aforementioned policy have
> been handled, adjusted, negotiated or settled,
> including, but not limited to, claims based on . . .

Pennsylvania Bad Faith Insurance Law, or any other
law applicable to insurance practices. . . . We
additionally release Harco for any claims we have
under any theory of bad faith or unfair claims handling
practices.

Id. App. 56a-57a (emphasis added).

On or about September 27, 1995, counsel for BTS sent a
letter to Harco outlining a proposal to adjust the business
interruption and extra expense portion of BTS's claims. In
that letter, BTS explained why it was not possible to repair
the existing structure, and also outlined its intent to
construct a new, smaller facility to temporarily house its
business while the damaged building was being replaced.
The letter specifically informed Harco that "The contractor
who will be doing the work would like to begin erecting the

4

Addition this fall in order to be able to start replacement of
the existing building in the early spring. Accordingly, we
would like to resolve this issue as soon as possible." App at
222a. Therefore, Harco clearly knew that it was highly
improbable that BTS would not be able to complete
replacement of the damaged building before March 5, 1996,
the second anniversary of the partial collapse.

Even though the Commercial Property Conditions portion
of the policy contained the aforementioned requirement that
the insured bring any legal action within two years of the
"direct physical loss or damage," the Business Income
Coverage Form (And Extra Expenses) coverage part of the
policy stated:

> We will pay for the actual loss of Business Income you
> sustain due to the necessary suspension of your
> "operations" during the "period of restoration." The
> suspension must be caused by direct physical loss of,
> or damage to property at the premises described in the
> Declarations, . . . resulting from any Covered Cause of
> Loss.

App. at 40a. The policy also states under S 3 of the
Business Income Coverage Form: "We will pay any Extra
Expense to minimize the suspension of business if you
cannot continue `operations' . . . to the extent that it [the
Extra Expense] reduces the amount of loss that otherwise
would have been payable under this Coverage Form."
Section 3 of the policy defines the covered "extra expense"
as follows:

> Extra expense means necessary expenses you incur

during the "period of restoration" that you would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss.

App. at 40a. Under the policy, Harco also undertakes to pay:

(1) . . . any Extra Expense to avoid or minimize the suspension of business and to continue "operations":

(a) At the described premises; or

5

(b) At replacement premises or at temporary locations, including:

(i) Relocation expenses; and

(ii) Costs to equip and operate the replacement or temporary locations.

Id. The "Period of Restoration" as used in S 3 of the "Business Income Coverage Form (And Extra Expense)" is defined as:

the period of time that:

a. Begins with the date of direct physical loss or damage caused by or resulting from any Covered Cause of Loss at the described premises; and

b. Ends on the date when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality.

App. at 46a.

II.

From October 18, 1995, until the present litigation was filed, Harco and BTS exchanged numerous letters in an attempt to settle the business interruption claim. In a letter dated October 18, 1995, Harco told BTS, "once the reconstruction on the building is completed," Harco would require certain financial documents before settling the claim. App. at 224a-25a (emphasis added). Harco did not suggest in that letter, or in any of its other numerous and regular communications with BTS, that Harco believed that the aforementioned two year limitation period began to run on March 5 when the building collapsed. As noted above, BTS's September 27 letter to Harco informed Harco that

BTS would not be able to begin construction on a replacement building until the spring of 1996. Thus, Harco was clearly alerted (by that letter as well as by numerous other communications) to the possibility that BTS may not be able to present its claim for business interruption insurance until more than two years after the date of the partial collapse. Nevertheless, in several of its communications to BTS, Harco stated that it (Harco) would

6

address the business interruption claim upon the termination of the reconstruction period. Indeed, in a letter dated January 2, 1996, discussing possible settlement, Harco advised BTS that "we can settle the business income and extra expense claim after the loss is actually incurred and upon our receipt of satisfactory documentation .. ." See, generally, App. at 205a–206a, 229a–41a.

BTS did not complete reconstruction of the building until on or about January 1, 1997. App. at 157a. On January 14, 1997, BTS's lawyer sent Harco's lawyer a letter and several documents that Harco had requested BTS to send upon completion of the reconstruction of the property. App. at 232a. On February 27, 1997, BTS submitted an evaluation of the business interruption loss, as per Harco's request. Harco did not then assert the two year limitation under the policy as it now does. Rather, on March 7, 1997, Harco requested additional information that it purportedly needed to process BTS's claim. App. at 264a. This pattern continued and Harco's investigation of BTS's claim remained open until December 10, 1997, when BTSfinally filed the instant suit against Harco. The district court granted Harco's motion for summary judgment and dismissed BTS's claims and, after the district court denied reconsideration, BTS filed the instant appeal.

III.

Our review of the grant of summary judgment is plenary. W.B. v. Matula, 67 F.3d 484, 493 (3d Cir. 1995). "Summary judgment is appropriate when there are no issues of material fact . . . and the moving party is entitled to judgment as matter of law." Id. The interpretation of an insurance contract is a question of law that is properly decided by the court, Reliance Insurance Co. v. Moessner, 121 F.3d 895, 900 (3d Cir. 1997), unless the court determines that the contract is ambiguous, in which case the interpretation of the ambiguous term is a question of fact. Sanford Investment Co. v. Ahlstrom Machinery Holdings, Inc., 198 F.3d 415, 420 (3d Cir. 1999); Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38 F.3d 107, 111 (3d Cir. 1994). Here, we are concerned with the operation and

application of the limitations provision to the damage BTS

incurred. Accordingly, our review is plenary. See Vanguard Telecommunications v. So. New England Tel., 900 F.2d 645, 650 (3d Cir. 1990) ("The questions involved in this case are concerned `with the legal operation of the agreement,' because we . . . are not called upon to fill a gap in the agreement, but only to determine the legal effect of the agreement.").

IV.

A.

BTS argues that the district court erred in holding"that BTS's business interruption claim was barred by the policy provision requiring suit to be commenced within two years of the direct physical loss or damage." Appellant's Br. at 14. BTS claims that, "[i]n the context of a business interruption claim, the `damage' is the business interruption loss, and the limitation period begins to run from the date of the business interruption." Appellant's Br. at 14. 1 The district court found that "the date of the direct damage is the starting point, and costs could have been estimated at that time." Op. at 5. Harco insists that the limitation under the policy requires that the action be filed within two years of March 5, 1994, because that was the date of the"direct physical loss or damage,"2 under the policy. See App. at 19a.

As noted above, the Business Income provisions of the policy provide for the payment of "necessary expenses"

_____

1. Additionally, BTS argues that even if the time to file did expire, "Harco waived, extended, suspended, or is otherwise estopped from relying on this provision." Appellant's Br. at 15. However, we need not reach the issue of whether Harco waived its right to assert its time limitations defense.

2. Harco also claims that BTS violated the policy's requirement that "No one may bring a legal action against [Harco] under this Coverage Part unless: There has been full compliance with all of the terms of this Coverage Part." App. at 19a. Harco alleged that BTS failed to submit to an examination under oath which it was obligated to do under the policy. See Appellee's Br. at 14. However, that was not the basis of the district court's ruling and that issue is not before us.

incurred during the " `period of restoration' that [BTS] would not have incurred if there had been no direct physical loss or damage to property caused by or resulting from a Covered Cause of Loss." App. 40a. The policy further provides that Harco will "pay any Extra Expense to avoid or minimize the suspension of business and to continue `operations.' " App. at 40a. Moreover, the"period of restoration" is defined in section G of the Business Income Coverage Form as beginning when the initial property loss is suffered and it "[e]nds on the date when the property at the described premises should be repaired, rebuilt, or replaced with reasonable speed and similar quality." App. at 46a.3

This insurance policy clearly provides coverage for"extra expense" the insured incurs "during the period of restoration" that would not have occurred absent"physical . . . damage to the property." However, the "period of restoration" "begins with the date of direct physical . . . damage caused by . . . any Covered Cause," and"ends on the date when the property . . . should be rebuilt or replaced with reasonable speed and similar quality." App. at 46a. If Harco's assertion that any suit for business interruption coverage must be brought within two years of the date the property is damaged is correct, then such a claim would be impossible to bring when the necessary reconstruction is not completed until more than two years from the date the property is damaged. Such a reading would render Harco's coverage illusory in situations like the one before us now. As noted above, Harco was aware that the period of restoration might not end until a date that was more than two years from the time the covered property was damaged. The policy specifically provides that the two year limitation in the Commercial Property Conditions is subject to "Additional Conditions in Commercial Property Coverage Forms." App. at 19a. This appears to include the aforementioned definitions and conditions of coverage pertaining to business income, extra expense, and period of restoration, contained in the Business Income Coverage Form.

_____

3. The policy also provides that "[t]he expiration date of this policy will

not cut short the "period of restoration." Id.

9

Thus, the district court could not properly conclude as a matter of law that the period for filing suit contained in the Commercial Property Conditions Part does not apply to

business income loss protections. The wording of Harco's policy refers to different "parts" of the policy. As noted above, the two year limitation is contained in S D of the Commercial Property Conditions "part." That limitation states: "No one may bring a legal action against us under this Coverage Part unless . . . " (emphasis added). App. at 19a. BTS's claim for business interruption insurance arises under a different "part" of the policy entitled: "Business Income Coverage Form (And Extra Expense)", and that "part" of the policy does not contain a similar time bar. App. 40a.

Our interpretation of the policy is corroborated by the contemporary course of dealing of the parties. That course of dealing clearly counsels against Harco's claim that the two year limitations provision applied to BTS's business interruption coverage. In Bensalem Township v. International Surplus Lines Ins. Co., 38 F.3d 1303, 1309 (3rd Cir. 1994) we noted that Pennsylvania courts have stated, "[c]ourts must examine the totality of the insurance transaction involved to ascertain the reasonable expectation of the insured." (citing Everett Cash Mut. Ins. Co. v. Krawitz, 633 A.2d 215, 216 (Pa. Super. 1993)). Here, the "totality of the insurance transaction" includes the several requests that Harco made for additional documentation of BTS's business income coverage during and after the purported two year limitation period. Given Harco's conduct, BTS could not have reasonably expected that the two-year clock was ticking. We will not now interpret this contract in such a way as to negate the entire course of dealing between Harco and BTS after March 1994. That course of dealing reflects the parties' own interpretation of this insurance policy, and it is very relevant to our analysis. "The interpretation of insurance contracts to accord with the reasonable expectations of the insured, regardless of the existence of any ambiguity in the policy, constitutes judicial recognition of the unique nature of contracts of insurance." Murray v. United of Omaha Life Ins. Co., 145 F.3d 143, 154 (3rd cir. 1998) (resisting an interpretation of an insurance policy that would "defeat, rather than promote, the purpose

10

of the . . . insurance. . .") (internal quotation marks and citations omitted).4

Thus, we hold as a matter of law that the two year period of limitations established under the policy does not apply to BTS's claim for business interruption coverage.

B.

The district court also held that BTS released Harco from

any future bad faith claim involving Harco's handling of BTS's business interruption loss. Harco argues that"[t]he Release excepts all claims relating to BTS's business interruption claim, including any bad faith claim." BTS claims that "[t]he express language of the Release applies only to BTS's bad faith claim for Harco's past conduct, and does not apply to any future bad faith claim based on Harco's future handling of BTS's business interruption loss." Appellant's Br. at 16. We agree.

"A signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake." Three Rivers Motor Co. v. Ford Motor Co., 522 F.2d 885, 892 (3d Cir. 1975); see also Billman v. Pennsylvania Assigned Claims Plan, 503 A.2d 932, 935 (Pa. Super. 1986); ACF Produce, Inc. v. CHUBB/Pacific Indemnity Group, 451 F.Supp. 1095, 1101 (E. D. Pa. 1978). However, "a release covers only those matters which may fairly be said to have been within the contemplation of the parties when the release was given." Restifo v. McDonald, 230 A.2d 199, 201 (Pa. 1967). Thus, "the general words of the release will not be construed so as to bar the enforcement of a claim which has not accrued at the date of release." Id. (referring to those claims contemplated by both parties at the time of execution). However, that is exactly what the district court did here. By holding that the general words of BTS's release applied to future claims for loss of business income, the court stretched the language of the Release beyond the words agreed upon by the parties,

_____

4. In Murray, we were interpreting a contract of health insurance, but the analysis there is nevertheless relevant to our present inquiry given the parameters of this dispute.

11

and applied them to future claims that are not included in the language of BTS's general release. The parties agreed that BTS was releasing such claims for Harco's handling of BTS's claims that "[BTS] may have under the theory of bad faith . . . ." The parties did not agree that BTS was releasing any such claims that it may now have, or may have at any time in the future. "[T]he general rule for construction of releases is that the intention of the parties must govern, but this intention must be gathered from the language of the release." Three Rivers Motors Co. v. Ford Motor Co., 522 F.2d at 892. This release reflects an intention to release claims BTS may have had at the time the release was entered into, but not to release any such claims that may accrue in the future. Only the present tense appears in the relevant portions of the release. Harco's argument would have us reword the release and insert the future tense that

is now absent.

Releases are strictly construed "so as to avoid the ever present possibility that the releasor may be overreaching." Restifo v. McDonald, 230 A.2d at 201. Thus, even if we concluded that the scope of the release was ambiguous, we would still find, as a matter of law that this release did not include future claims of bad faith that accrued based upon the manner in which Harco handled BTS's claim for business interruption coverage after the release was executed. See Three Rivers, 522 F.2d at 887.

V.

For the reasons set forth above, we will reverse the ruling of the district court and remand for further proceedings consistent with this opinion.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit

12