

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-11-2003

# Wastak v. Lehigh Valley Health

Precedential or Non-Precedential: Precedential

Docket No. 02-2111

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Wastak v. Lehigh Valley Health" (2003). *2003 Decisions.* Paper 418.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/418

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed June 10, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-2111

JOHN R. WASTAK,
Appellant

v.

LEHIGH VALLEY HEALTH NETWORK

Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 00-cv-04797)
District Court Judge: Honorable Herbert J. Hutton

Argued March 10, 2003

Before: RENDELL, AMBRO and MAGILL,*
*Circuit Judges.*

(Filed June 10, 2003)

Donald P. Russo, Esq. [ARGUED]
117 East Broad Street
P.O. Box 1890
Bethlehem, PA 18016
   *Counsel for Appellant*

* The Honorable Frank J. Magill, Senior Circuit Judge of the United
States Court of Appeals for the Eighth Circuit, sitting by designation.

Jonathan B. Sprague, Esq.
 [ARGUED]
Post & Schell
1800 John F. Kennedy Boulevard
19th Floor
Philadelphia, PA 19103
   *Counsel for Appellee*

Benjamin N. Gutman, Esq.
 [ARGUED]
Equal Employment Opportunity
 Commission
1801 L. Street, N.W.
Washington, DC 20507
   *Counsel for Amicus-appellant Equal*
   *Employment Opportunity*
   *Commission*

## OPINION OF THE COURT

RENDELL, *Circuit Judge.*

John Wastak appeals from an order entered in the District Court on March 27, 2002, granting summary judgment in favor of his former employer, defendant Lehigh Valley Health Network, with regard to Wastak's allegations of age discrimination. The District Court held that Wastak's suit was precluded by a valid release agreement, pursuant to which Wastak, in exchange for various benefits, waived his right to assert any claims arising out of his employment or termination. We will affirm.

I.

In January of 1990, Lehigh Valley Health Network hired John Wastak as the Administrator for its Department of Psychiatry. Wastak held the position for eight years, during which time Wastak believed that Lehigh Valley was satisfied with his performance, and that his employment was secure.

Sometime in 1997, Wastak began negotiations to lease office space for the Department. That December, however,

the Psychiatry Department Chair, Dr. Michael Kauffman, directed Wastak to cease the discussions. Subsequently, the Department engaged in the lease negotiations with a different employee as its representative.

On March 12, 1998, Lehigh Valley fired Wastak, who was fifty-seven years old at the time. Dr. Kauffman indicated that the termination was a result of Wastak's conducting inappropriate lease negotiations. Wastak was given a proposed Separation Agreement and Release ("Release"), along with a letter explaining and supplementing its provisions. The Release states, in pertinent part:

> Wastak . . . herein agrees that [he will not] file a charge, complaint, lawsuit or other claim against [Lehigh Valley] . . . for any acts, omissions or statements arising out of any aspect of Wastak's employment or termination of Wastak's employment with [Lehigh Valley]. By way of example only and without limiting the immediately preceding sentence, Wastak promises not to file a claim or lawsuit under Title VII of the Civil Rights Act of 1964, the Age Discrimination in Employment Act (29 U.S.C. § 621), Section 1981 of the Civil Rights Act of 1866, the Equal Pay Act of 1963, the Rehabilitation Act of 1973 and Civil Rights Act of 1991, Pennsylvania Human Relations Act, Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 *et seq.*, and any other state or federal equal employment opportunity law or statute. In addition, Wastak agrees not to file any cause of action or claim relating to the breach of an oral or written contract, misrepresentation, defamation, interference with contract and intentional or negligent infliction of emotional distress, and any other common law claims and all claims for counsel fees and costs.

The Release also relevantly provided that (1) if litigation was brought in violation of the covenant not to sue, the prevailing party would be entitled to reasonable costs and attorneys' fees; (2) performance of each party was contingent on the other party's compliance with the terms of the agreement; (3) the Release contained all the promises and understandings of the parties; (4) Wastak was advised by Lehigh Valley to seek an attorney; (5) Wastak had

twenty-one days within which to sign the Release, and (6) Wastak could revoke acceptance of the Release within seven days of signing.

In exchange for his execution of the Release, Lehigh Valley offered Wastak income protection for a period of thirty-six weeks, paid biweekly. Under the provisions of the agreement, Wastak was guaranteed remuneration equivalent to his Lehigh Valley salary, whether or not he secured other employment during the benefits period. Thus, if Wastak accepted lower-paid employment prior to the end of the period, Lehigh Valley would cover the difference in salary, but Wastak's benefits would terminate if he was able to secure employment at a salary equal to or exceeding his salary at Lehigh Valley. Lehigh Valley also promised Wastak the free use of a professional outplacement firm.

As noted above, the Release provided that Wastak could sign the agreement anytime within twenty-one days, and Lehigh Valley advised Wastak to consult an attorney before signing. Unfortunately, however, Wastak's attempts to secure counsel were unsuccessful as, for various reasons, none of the three lawyers Wastak contacted could or would represent him. Nonetheless, Wastak signed the Release.

The day of his termination, Lehigh Valley told Wastak that it intended to hire a replacement for him. Nine months later, in December of 1998, Wastak, who was then fifty-eight, learned that Lehigh Valley had replaced him with a forty-four year old woman. Then suspecting that he was fired as a result of age discrimination, Wastak secured legal counsel, and on July 20, 1999 — 495 days after his termination — filed an age discrimination charge with the Equal Employment Opportunity Commission ("EEOC"). Under 29 U.S.C. § 626(d)(2), however, the EEOC charge was required to be filed within 300 days of the accrual of the cause of action. On March 1, 2000, the EEOC dismissed the charge as untimely.

That August, Wastak filed suit in the Court of Common Pleas of Lehigh County, claiming age discrimination in violation of the Pennsylvania Human Relations Act, 43 P.S. §§ 951, *et seq.* ("PHRA"), and the Age Discrimination in Employment Act, 29 U.S.C. § 623 *et seq.* ("ADEA"). A month

later, Lehigh Valley removed the action to the federal court in the Eastern District of Pennsylvania. In an opinion dated March 27, 2002, the District Court granted Lehigh Valley's Motion for Summary Judgment on the basis of the Release. The District Court rejected Wastak's claims that the waiver was void under the provisions of the Older Workers Benefit Protection Act, 29 U.S.C. § 626 ("OWBPA"), or that the agreement was otherwise invalid because he did not enter into it knowingly and voluntarily. According to the District Court, the Release executed by Wastak and Lehigh Valley was legally valid, and by its plain language barred the suit by Wastak under the PHRA or ADEA. Wastak then filed this timely appeal.

The District Court had jurisdiction pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367, and we have jurisdiction under 28 U.S.C. § 1291. Our review of a district court's grant of summary judgment is plenary, and we apply the same standard as the district court. *See Abramson v. William Paterson College of N.J.*, 260 F.3d 265, 276 (3d Cir. 2001). Summary judgment is appropriate when there are no genuine issues of material fact and, viewing the evidence in the light most favorable to the non-moving party, the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Abramson*, 260 F.3d at 276.

## II.

Wastak initially takes the position that the District Court erred in finding that this particular claim is barred because his cause of action is not covered by the terms of the Release. He asserts that it arose long after he executed the Release, i.e., when he learned that Lehigh Valley had replaced him with a younger employee. Additionally, Wastak makes a number of attacks on the validity of the Release itself. According to Wastak, the Release is without legal effect because it failed to satisfy the exacting standards of the OWBPA. He argues that the Release invalidly prohibited him from filing a charge with the EEOC, was structured to discourage him from filing such a charge, and is independently invalid because it provided for the recovery of costs and attorneys' fees in violation of

EEOC regulations. Finally, Wastak asserts that the Release was unsupported by adequate consideration, and was not entered into knowingly and voluntarily.

In addition to responding to Wastak's arguments, Lehigh Valley asserts that Wastak's claim must be dismissed simply because it was untimely. Although the EEOC did in fact find the claim time-barred, Wastak maintains that we should consider the relevant statute of limitations to have been equitably tolled given the circumstances of this case. Because we affirm the District Court's conclusion that the Release was valid and, accordingly, barred Wastak's filing of these claims, we need not reach the various timeliness issues.

A.

By the plain terms of the Release, Wastak agreed not to bring any actions against Lehigh Valley arising from his employment or termination under the PHRA or ADEA. Yet Wastak contends that his present age discrimination causes of action are not barred by the Release because the claims had not yet accrued when the Release was executed. Under the OWBPA, employees may not waive their rights to ADEA claims that "arise after the date the waiver is executed." 29 U.S.C. § 626(f)(1)(C). Thus, if Wastak's present causes of action did not arise until after the Release was executed, they could not have been waived in the Release and Lehigh Valley cannot now raise the Release as a defense.

Wastak asserts that his age discrimination claims did not accrue until December 1998, when he learned of his replacement by a younger worker and was thus potentially enabled to establish his prima facie case. We cannot agree. Wastak's argument misconceives the nature of the "discovery rule" in employment discrimination cases, and is precluded by our decision in *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380 (3d Cir. 1994).

In *Oshiver*, we considered the timeliness of claims made by a female attorney, Oshiver, under Title VII and the PHRA. On April 10, 1990, Oshiver was dismissed from her position as an hourly attorney for a law firm. *Id.* at 1384. The firm indicated that she was being terminated because

of insufficient work, but stated that they would contact her if another hourly attorney or associate position became available. *Id.* In May of 1991, Oshiver discovered that the firm had hired a male attorney to replace her, and in January of 1992, Oshiver learned that a male attorney had been hired as an associate. *Id.* That December, Oshiver filed a lawsuit alleging wrongful discharge and wrongful failure to hire. *Id.*

On appeal, we upheld the District Court's dismissal of Oshiver's claims as untimely. Like Wastak, who argues that his claim did not arise until he learned that he had been replaced by a younger individual, Oshiver argued that her claim did not arise, and the limitations period did not begin to run, until she first discovered that the firm had replaced her with a male attorney. *Id.* at 1385. We rejected that argument, stating that under the discovery rule a cause of action accrues the moment the plaintiff "either is aware, or should be aware, of the existence of and source of an injury." *Id.* at 1386. Thus, with regard to Oshiver's claim of discriminatory discharge, we stated:

> [W]e have no difficulty in concluding that for purposes of the discovery rule, Oshiver "discovered" the injury on April 10, 1990, the very date defendant law firm informed her of her discharge. Simply put, at the moment the law firm conveyed her dismissal to her, Oshiver became aware (1) that she had been injured, i.e., discharged, and (2) that this injury had been caused by another party's conduct.

*Id.* at 1390-91.

Similarly, here it is clear from the record that Wastak's injury was complete and discovered when Lehigh Valley terminated him. At that point, Wastak knew both of his injury — the discharge — and the cause of his injury — Lehigh Valley's decision to terminate his employment. Wastak argues strenuously that he had little reason to believe that he was the victim of age discrimination until he learned that he had been replaced by a younger employee.[1]

---

1. In addition, Wastak argues that he was unable to make out a prima facie case until he was replaced. However, in *Pivirotto v. Innovative*

That may well be true, but it has little to do with whether his claim was prospective in March of 1998, a question that depends solely on when his claim accrued under the discovery rule.[2] And, as we made clear in *Oshiver*, "a claim accrues in a federal cause of action upon awareness of actual injury, not upon awareness that this injury constitutes a legal wrong." *Id.* at 1386; *see also id.* at 1391 ("That Oshiver may have been deceived regarding the underlying motive behind her discharge is irrelevant for purposes of the discovery rule."); *accord Amini v. Oberlin College*, 259 F.3d 493, 498-500 (6th Cir. 2001) (holding that the statute of limitations began to run when the plaintiff was notified of the employment action at issue); *Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1235 (10th Cir. 1999) ("While the hiring of new, younger employees might be evidence of Coors' alleged discriminatory intent at the time appellants left Coors, it is the alleged discriminatory 'discharge' that appellants seek to redress."); *Thelen v. Marc's Big Boy Corp.*, 64 F.3d 264, 267 (7th Cir. 1995) ("A plaintiff's action [under the ADEA] accrues when he discovers that he has been injured, not when he determines that the injury was unlawful. . . . [Appellant's] injury was his termination."); *Dring v. McDonnell Douglas*

---

*Systems, Inc.*, 191 F.3d 344, 347 (3d Cir. 1999), we held that "a plaintiff claiming discriminatory firing need not prove, to make out a prima facie case, that she was replaced by someone outside the relevant class." All that is necessary is "evidence adequate to create an inference" that he was fired because of his age. *Id.* at 355 (quotations omitted). And, as the District Court noted, "The Record reflects that the Plaintiff believed inferences of age discrimination existed at the time of his discharge."

2. By contrast, such considerations may be relevant to the question of whether the statute of limitations should be considered equitably tolled under particular factual circumstances. *See, e.g., Oshiver*, 38 F.3d at 1389 ("[W]here a defendant actively misleads the plaintiff regarding the reason for the plaintiff's dismissal, the statute of limitations . . . will be tolled, until the facts which would support the plaintiff's cause of action are apparent, or should be apparent to a person with a reasonably prudent regard for his or her rights."). Indeed, much of Wastak's brief is devoted to arguing that his claim was not untimely under principles of equitable tolling. As stated above, however, we need not reach these arguments because Wastak's suit is barred by the valid Release.

*Corp.*, 58 F.3d 1323, 1328 (8th Cir. 1995) ("In the context of an ADEA action, . . . the limitations period begins to run when the plaintiff receives notice of a termination decision."). *See generally Forbes v. Eagleson*, 228 F.3d 471, 485 (3d Cir. 2000) (applying discovery rule); *New Castle County v. Halliburton NUS Corp.*, 111 F.3d 1116, 1124-25 (3d Cir. 1997) (same).

Wastak's present suit alleges age discrimination in violation of the PHRA and ADEA, claims which, under the discovery rule, accrued on March 12, 1998, the date of his discharge. We must therefore reject Wastak's argument that his claims are not precluded by the Release because they arose after the execution of that document.

B.

Wastak makes several challenges to the Release itself, relying heavily on the OWBPA, which amended the ADEA and governs the validity of waivers of ADEA rights. *See, e.g., Oubre v. Entergy Operations, Inc.*, 522 U.S. 422, 426-27 (1998) (discussing the OWBPA generally); *Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1534-35 (3d Cir. 1997) (same). The OWBPA provides that all ADEA waivers must be "knowing and voluntary," and mandates that no waiver is to "be considered knowing and voluntary unless at a minimum" it satisfies each of a set of listed requirements. 29 U.S.C. § 626(f)(1). The statutory requirements are fairly straightforward, and the Release executed here appears to satisfy each of the enumerated prerequisites for a knowing and voluntary waiver.[3] However, Wastak and the EEOC,

---

3. The OWBPA's minimum waiver requirements are as follows:

> (A) the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

> (B) the waiver specifically refers to rights or claims arising under this chapter;

> (C) the individual does not waive rights or claims that may arise after the date the waiver is executed;

> (D) the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

who appears before us as amicus, argue that for various reasons this Release does not in fact satisfy the OWBPA's stringent requirements and, thus, "can have no effect on [his] ADEA claim." *Oubre*, 522 U.S. at 427.

Wastak's first argument involves a challenge to the specific language in the Release that provided that he agreed not to "file a *charge*, complaint, lawsuit or other claim against [Lehigh Valley]." Wastak asserts that this charge-filing ban conflicts with the following section of the OWBPA:

> No waiver agreement may affect the Commission's rights and responsibilities to enforce this chapter. No waiver may be used to justify interfering with the protected right of an employee to file a charge or

---

(E) the individual is advised in writing to consult with an attorney prior to executing the agreement;

(F)(I) the individual is given a period of at least 21 days within which to consider the agreement; or (ii) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the individual is given a period of at least 45 days within which to consider the agreement;

(G) the agreement provides that for a period of at least 7 days following the execution of such agreement, the individual may revoke the agreement, and the agreement shall not become effective or enforceable until the revocation period has expired;

(H) if a waiver is requested in connection with an exit incentive or other employment termination program offered to a group or class of employees, the employer (at the commencement of the period specified in subparagraph (F)) informs the individual in writing in a manner calculated to be understood by the average individual eligible to participate, as to — (i) any class, unit, or group of individuals covered by such program, any eligibility factors for such program, and any time limits applicable to such program; and (ii) the job titles and ages of all individuals eligible or selected for the program, and the ages of all individuals in the same job classification or organizational unit who are not eligible or selected for the program.

29 U.S.C. § 626(f)(1).

> participate in an investigation or proceeding conducted by the Commission.

29 U.S.C. § 626(f)(4). Accordingly, Wastak argues that the Release is rendered void because in it he agreed not to file a charge with the EEOC. While perhaps superficially appealing, Wastak's argument is undermined by the language, structure, and legislative history of the OWBPA, as well as relevant case law.[4] In addition, the EEOC's reliance on policy arguments is unavailing. We will discuss each of these aspects in turn.

In interpreting any statute, we begin with the statute's plain language. *See, e.g., Kaiser Aluminum & Chem. Corp. v. Bonjourno*, 494 U.S. 827, 835 (1990); *Mitchell v. Horn*, 318 F.3d 523, 535 (3d Cir. 2003). Unlike the preceding subsections of the statute, § 626(f)(4) does not deal with the validity of waiver agreements at all. *See Thiessen v. General Electric Capital Corp.*, 232 F. Supp. 2d 1230, 1242-43 (D. Kan. 2002). Rather, its language is very specific and provides only that waivers may not (1) "affect the Commission's rights and responsibilities to enforce" the ADEA, or (2) "be used to justify interfering with the protected rights of an employee" to file an EEOC charge or participate in an EEOC investigation. 29 U.S.C. § 626(f)(4). In stark contrast to the mandatory prerequisites listed for waiver agreements under § 626(f)(1), then, there is no clear statutory indication that a waiver agreement that contains a provision that runs afoul of the provisions of § 626(f)(4) is suspect, let alone invalid. Indeed, the language suggests just the opposite. The statute essentially states that, whatever its provisions, a privately executed waiver

---

4. Wastak asserts that the OWBPA "explicitly states that the party seeking to enforce the terms of an ADEA waiver agreement carries the burden of proof at all times," and argues that the District Court erred in failing to appreciate that Lehigh Valley bore the burden of proving the waiver's validity. The statute, however, allocates the burden of proof to "the party asserting the validity of a waiver" only in connection with subsections (1) and (2) of § 626. 29 U.S.C. § 626(f)(3). Thus, Wastak's primary challenge to the validity of the Release, namely, that it violates paragraph § 626(f)(4), does not fall within the ambit of the statute's burden of proof allocation. We are convinced, however, that this Release is valid whichever party was to have borne the burden of proof.

agreement cannot alter or obstruct the EEOC's ability to exercise its rights and responsibilities, and that an employer may not invoke a waiver in an attempt to impede an employee's participation in EEOC procedures. Both requirements appear to contemplate the validity of an underlying waiver of a legal action and deal only with the administrative process — namely, the right of the EEOC to do its job and the right of the employee to file a claim with the agency. At most, the statutory language can be read to mean only that a provision that purports to, for example, alter the EEOC's rights to pursue and investigate a claim that is filed, is unenforceable. *See EEOC v. Johnson & Higgins, Inc.*, 91 F.3d 1529, 1536 (2d Cir. 1996) (stating that where the EEOC has the authority to enforce the ADEA, "that authority cannot be altered by a waiver of the rights of a private party — even a private party with a direct interest in the subject of concern to the EEOC"). In sum, the statute is clear that any attempt by an employer to *enforce* a contractual provision prohibiting an employee from filing a charge or participating in an EEOC investigation would be ineffectual, but there is no indication that the mere presence of that contractual language would void an otherwise knowing and voluntary waiver.

Moreover, here there was no apparent violation of the clear terms of § 626(f)(4). Wastak does not allege that the Release "affect[ed] the Commission's rights and responsibilities," or that Lehigh Valley interposed the Release or otherwise "use[d] [it] to justify interfering with" Wastak's protected right to file that charge. Wastak in fact filed an EEOC charge, and Lehigh Valley does not take issue with the filing of that charge, but only with the subsequent filing of a *lawsuit* in violation of the terms of the Release.

The structure of § 626(f) supports this plain meaning interpretation. The statute is divided into four subsections. As noted above, the first enumerates a list of mandatory prerequisites for a valid waiver. The second sets forth a narrow exception to those requirements. The third allocates the burden of proof with regard to disputes about the first two subsections, placing on the party asserting the waiver the burden to prove that it was made knowingly and

voluntarily. Finally, § 626(f)(4), the subsection in question, clarifies that even otherwise statutorily compliant waiver agreements cannot be used to interfere with the EEOC's exercise of its duties, or with an employee's right to complain to the agency. The provision is crucially distinct from the list of necessary prerequisites for a valid waiver. *See Thiessen*, 232 F. Supp. 2d at 1242-43. Had Congress intended that a charge-filing ban of the sort found here would operate to invalidate a waiver, it could have either stated so explicitly, or, more consistently with the structure of the statute, simply included a provision similar to § 626(f)(4) within the list of enumerated prerequisites in § 626(f)(1). It did neither.

The legislative history suggests, moreover, that Congress's choice in structuring § 626(f) as it did was not merely fortuitous. Neither the Senate Report nor the House Report contain the slightest indication that § 626(f)(4) was to be considered among the prerequisites for a valid waiver. Further, the Senate Report, which accompanied the version of the legislation ultimately adopted by Congress, and which offers the only specific discussion of this subsection, distinctly suggests that the requirements of the subsection were *not* meant to void an otherwise knowing and voluntary waiver. Under the subheading "Right to Participate in EEOC Proceedings," the Senate Report states, in full:

> The legislation provides that a waiver may not interfere with the EEOC's rights and responsibilities to enforce the ADEA, nor may such a waiver be used to interfere with the employee's protected right to file a charge or to participate in an EEOC investigation or proceeding. The Committee intends this provision as a clear statement of support for the principle that the elimination of age discrimination in the workplace is a matter of public as well as private interest. No waiver agreement may be permitted to interfere with the achievement of that goal. This position is consistent with the holding and reasoning of *EEOC v. Cosmair, Inc.*, 821 F.2d 1085 (5th Cir. 1987). An employee may validly waive the right to recover in his own lawsuit as well as the right to recover in a suit brought by the Commission on his own behalf.

S. Rep. 101-263, at 35 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1541.

Notably, the Report does not refer to or even hint at the potential invalidity of particular waivers. To the contrary, the resounding message is that § 626(f)(4) was meant only to establish that waiver agreements between employers and employees have no effect on the EEOC's ability to carry out its public duties, and that the employer may not *use* a waiver to *interfere* with the employee's rights to participate in EEOC processes. That is, the intent of the subsection is not to impose new restraints on private waivers, but to ensure that those waivers do not materially interfere with the EEOC's pursuit of the public's interest in eradicating age discrimination from the workplace. A waiver's release of rights to pursue or participate in a *lawsuit*, as Lehigh Valley interposes here — which is essentially the focus of the remainder of § 626 — remains intact.

We note further that, because it was specifically endorsed in the Senate Report, *EEOC v. Cosmair, Inc.*, 821 F.2d 1085 (5th Cir. 1987), is particularly instructive. There the Court of Appeals for the Fifth Circuit considered the case of an employee who filed a charge with the EEOC alleging age discrimination after signing a waiver in exchange for severance benefits. *Id.* at 1087. The employee's EEOC charge, however, did not request relief. *Id.* Subsequently, the employer terminated the employee's severance benefits, claiming that the employee had violated the waiver agreement. *Id.*

The court began by noting that EEOC charges are distinct from typical employee claims against an employer in that their purpose "is not to seek recovery from the employer but rather to inform the EEOC of possible discrimination." *Id.* at 1089. Accordingly, the court found that the employee, who had waived "all actions, causes of action, claims and demands whatsoever," had not actually waived his right to file an EEOC charge. *Id.* Further, to the extent the agreement was meant to forfeit such rights, the court noted that "[a]llowing the filing of charges to be obstructed by enforcing a waiver of the right to file a charge could impede EEOC enforcement of the civil rights laws." *Id.* at 1090. It thus concluded that any "waiver of the right

to file a charge is void as against public policy," and, therefore, that "any attempt by [the employee] to waive his right to file a charge is void." *Id.* at 1090. The court made clear, however, that "the fact that a waiver of the right to file a charge is void does not invalidate a waiver of a cause of action with which it is conjoined."[5] *Id.* at 1091.

As stated above, the Senate Report indicated that § 626(f)(4) was meant to be consistent with both the "holding and reasoning" of *Cosmair*. Accordingly, two conclusions may be permissibly drawn from that decision about Congress's intent for § 626(f)(4), both of which support our analysis thus far. First, the provision was intended to prohibit employers from using waivers to interfere with the filing of a charge by, for instance, refusing to perform under the agreement if an EEOC claim is filed. In *Cosmair*, the court held that an employer's recourse to a waiver provision under such circumstances would be unenforceable, and the statute similarly renders such attempts clearly ineffectual. Second, a knowing and voluntary waiver of the right to sue is not void solely because it also references a charge-filing ban, a conclusion explicitly adopted by the court in *Cosmair. See Cosmair*, 821 F.2d at 1091; *see also, e.g.*, *McCall v. U.S. Postal Service*, 839 F.2d 664, 666 n\* (Fed. Cir. 1988) ("[E]ven if McCall's attempted waiver of his right to file EEOC charges is void, that would not affect the validity of the other portions of the agreement."). Notably, the court in *Cosmair* cited for this proposition the Restatement of Contracts, recognizing that the conclusion is largely driven by a straight-forward application of well-settled principles of contracts law. *See Cosmair*, 821 F.2d at 1091 (citing Restatement (Second) of Contracts § 184(1) (1981) ("If less

---

5. The court also stated that "although an employee cannot waive the right to file a charge with the EEOC, the employee can waive not only the right to recover in his or her own lawsuit but also the right to recover in a suit brought by the EEOC on the employee's behalf." *Cosmair*, 821 F.3d at 1091. This holding was echoed in the Senate Report. *See* S. Rep. 101-263, at 35 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1541 ("An employee may validly waive the right to recover in his own lawsuit as well as the right to recover in a suit brought by the Commission on his own behalf.").

than all of an agreement is unenforceable . . . a court may nevertheless enforce the rest of the agreement in favor of a party who did not engage in serious misconduct if the performance as to which the agreement is unenforceable is not an essential part of the agreed exchange.")).

We recently had occasion to consider a similar set of questions in *Spinetti v. Serv. Corp. Int'l*, 324 F.3d 212 (3d Cir. 2003). At issue in *Spinetti* was the enforceability, under Pennsylvania law, of an employment arbitration agreement that included certain provisions that conflicted with federal law. *Id.* at 213. We held that the offensive provisions could be severed without disturbing the enforceability of the remainder of the agreement. *Id.* at 213-14. Although our decision in *Spinetti* is in some ways distinguishable from the case before us, several of the principles underlying that decision are equally applicable here. As Judge Aldisert pithily noted, "You don't cut down the trunk of a tree because some of its branches are sickly." *Id.* at 214. Put simply, the presence of a sickly charge-filing ban does not render this Release involuntary, unknowing, or otherwise void.

Perhaps recognizing the fatal weaknesses in Wastak's argument that this Release is void solely because it contains an unenforceable charge-filing ban under § 626(f)(4), the EEOC offers an alternative but related argument for invalidating the waiver. The EEOC maintains that this Release *does* violate one of § 626(f)(1)'s enumerated prerequisites for a knowing and voluntary waiver because it is not "written in a manner calculated to be understood by" the employee. 29 U.S.C. § 626(f)(1)(A). According to the EEOC, by including the unenforceable prohibition on filing a charge, the agreement misrepresents Wastak's rights. "Since the waiver misstates Wastak's legal rights," the EEOC urges, "it is not written in a manner calculated to be understood as required by § 626(f)(1)(A)."

We are unable to accept the EEOC's conceptual leap. Although the EEOC is clearly correct to the extent it asserts that the agreement purports to deny Wastak a right he actually had, it has not offered a convincing rationale as to how that misstatement renders the agreement not understandable. We can find nothing at all inherently

incomprehensible about the language of the Release, and, indeed, Wastak admitted that he generally understood the terms of the Release. During a deposition, Wastak testified that, a few days after his termination, he was able to calm down and read the relevant documents, and that he understood that he was agreeing not to sue Lehigh Valley in exchange for thirty-six weeks of salary continuation and outplacement services. Further, neither Wastak nor the EEOC has pointed to anything in the language, structure, or legislative history of the OWBPA that supports the proposition that the Release's misstatement of Wastak's legal rights on this issue renders the entire waiver unknowing or involuntary under the statute. The EEOC's argument would incorporate the provisions of § 626(f)(4) into the minimum requirements for a knowing and voluntary waiver listed in § 626(f)(1) by way of the section's general mandate that waivers be written in an understandable fashion. Absent some compelling justification, we will not read the statute in a way that disturbs its meaning.

The EEOC's final recourse is to policy arguments, and it maintains that "[e]nforcing Wastak's waiver would hinder [its] efforts to enforce the ADEA." However, as we have noted, the waiver enforced by the District Court was solely as to Wastak's right to bring a lawsuit, and refusing to recognize a statutorily compliant and otherwise valid waiver would be equally contrary to statutory policy. Further, it is worth reiterating that no such imposition ever occurred in this case, as the EEOC was in fact presented with Wastak's claim. Finally, the EEOC's generalized claim of hindrance is neither adequately explained nor supported. Instead, the EEOC simply asserts that a ruling in Lehigh Valley's favor will encourage and embolden employers to include unenforceable charge-filing bans or other similar concoctions in their waiver agreements in wrongful attempts to dissuade terminated employees from filing EEOC charges or otherwise exercising their rights. We rejected a nearly identical argument from the EEOC in *Spinetti, see Spinetti,* 324 F.3d 223, and we remain unconvinced.[6]

6. We reiterate that this is not a case in which the employer clearly prohibited resort to administrative process, or in which the employee

Wastak also argues that the Release was invalid because it violated 29 C.F.R. § 1625.23(b). That regulation states:

> No ADEA waiver agreement, covenant not to sue, or other equivalent arrangement may impose any condition precedent, any penalty, or any other limitation adversely affecting any individual's right to challenge the agreement. This prohibition includes, but is not limited to, provisions requiring employees to tender back consideration received, and provisions allowing employers to recover attorneys' fees and/or damages because of the filing of an ADEA suit. This rule is not intended to preclude employers from recovering attorneys' fees or costs specifically authorized under federal law.

*Id.* Wastak alleges that Section V of the Release, in particular, violates this regulation. That section provides:

> In the event that suit is filed in breach of this covenant not to sue, it is expressly understood and agreed that

---

either understood that he was not permitted to file an EEOC charge, or did not do so based on the waiver. To the contrary, the plaintiff here seeks to void a waiver agreement because it contained the word "charge" in the prohibition section, notwithstanding the fact that he in fact pursued an administrative charge and does not contend that he was actually misled or disadvantaged by the language in any way. Wastak came before the district court desirous of proceeding in court, something he clearly agreed not to do. The only issue before us is whether, given the statutory provisions at issue and the facts before us, we would permit him to avoid the agreement he entered into.

We note, however, that a regulation that became effective after the incident before us clearly precludes the inclusion of provisions that prohibit resort to administrative process. *See* 29 C.F.R. § 1625.22(i)(2) ("No waiver agreement may include any provision prohibiting any individual from . . . [f]iling a charge or complaint, including a challenge to the validity of the waiver agreement, with [the] EEOC."). The presence of such a prohibition in a waiver agreement that is subject to this regulation could certainly lead a court to find, under proper circumstances, that the waiver "ha[d] the effect of misleading, misinforming, or failing to inform" the plaintiff, 29 C.F.R. § 1625.22(b)(4), thus rendering the waiver not "knowing and voluntary," and, therefore, invalid. But, again, that is not this case.

> this covenant shall constitute a complete defense to any such suit. In the event litigation is brought to enforce the terms of this paragraph, the prevailing party shall be entitled to recover reasonable costs and attorneys' fees.

We can find no conflict between the provisions of the Release and the terms of § 1625.23. The EEOC's anti-retaliatory regulation plainly prohibits employers from imposing any penalty or limitation upon the employee's right to challenge the validity of waiver agreements. But Wastak has not pointed to any term in the Release that could arguably be said to violate that provision. Despite Wastak's suggestions to the contrary, the Release does not "allow[ ] [Lehigh Valley] to recover attorneys' fees and/or damages because of the filing of an ADEA suit," as prohibited in the statute. 29 C.F.R. § 1625.23. Instead, it provides only for *prevailing party* costs and fees. *See, e.g.*, 65 Fed. Reg. 77,438, 77,442 (Dec. 11, 2000) (stating that the regulation prohibits "the use of provisions allowing the recovery of damages and/or attorneys' fees *simply because suit has been filed*" (emphasis added)). Such a provision does not impose a limitation or condition on the ability to challenge the waiver, but, rather, represents a recognized and accepted contractual arrangement for the shifting of fees at the termination of litigation.[7] Under such an

---

7. Wastak also appears to argue that this provision of the Release violates public policy in that it conflicts with the ADEA's provision that explicitly authorizes attorneys' fees to prevailing plaintiffs only. *See* 29 U.S.C. § 626(b) (incorporating 29 U.S.C. § 216(b)). We note, however, that a fee-shifting arrangement made pursuant to an enforceable contract is one of the primary common law exceptions to the American rule of fee allocation, *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240, 257 (1975), and there is little reason to believe that in enacting the ADEA Congress intended to abrogate those exceptions. *See, e.g.*, *Turlington v. Atlanta Gas Light Co.*, 135 F.3d 1428, 1437 (11th Cir. 1998) (allowing employer-defendant in ADEA suit to recover attorneys' fees under common law exception for claims brought in bad faith); 65 Fed. Reg. 77,438, 77,442 (Dec. 11, 2000) (agreeing with this line of decisions); *accord Hoover v. Armco, Inc.*, 915 F.2d 355, 356-57 (8th Cir. 1990); *Gray v. New England Tel. & Tel.*, 792 F.2d 251, 260 & n. 1 (1st Cir. 1986); *Morgan v. Union Metal Mfg.*, 757 F.2d 792, 796 (6th Cir. 1985); *Cesaro v. Thompson Publ'g Group*, 20 F. Supp. 2d 725, 726 (D.N.J. 1998); *Miller v. State Chem. Mfg. Co.*, 706 F. Supp. 1166, 1172 (M.D. Pa. 1988).

arrangement, a plaintiff who levels a successful attack on a waiver agreement will benefit by being entitled to recover his fees and costs. This is not the penalty proscribed by the regulation, which would punish the mere initiation of a suit, even if that suit was ultimately meritorious. In short, Wastak has offered absolutely no basis on which to conclude that the relevant terms of this Release could be construed as violating § 1625.23.[8]

Wastak's penultimate argument is that the Release is invalid because it was not supported by consideration. He cites to the OWBPA's mandate that all valid waivers be "in exchange for consideration in addition to anything of value to which the individual already is entitled." 29 U.S.C. § 626(f)(1)(D). According to Wastak, Lehigh Valley's offer of severance benefits did not constitute adequate consideration because the benefits took the form of income protection and therefore would cease if Wastak secured other employment at an equal or higher salary during the relevant period. This argument is without merit. Notwithstanding the fact that Lehigh Valley also provided Wastak with the free use of an outplacement firm, the thirty-six weeks of income protection was substantial and certainly "in addition" to what Wastak was entitled to upon his termination — nothing.

Finally, Wastak argues that the Release violated the general principles of the OWBPA in that, regardless of whether it satisfied the specific minimum prerequisites set forth in § 626(f)(1), it was not made knowingly and voluntarily. He relies on the fact that he was unable to secure counsel to review the relevant documents, and

---

8. We similarly reject Wastak's argument that the Release violated § 1625.23 because the reciprocal obligations clause of the contract was an unlawful limitation on his right to challenge the agreement, since Lehigh Valley could discontinue the payment of benefits if he posed such a challenge. The EEOC regulation is appropriately concerned with, for example, "provisions requiring employees to tender back consideration received, and provisions allowing employers to recover attorneys' fees and/or damages because of the filing of an ADEA suit." 29 C.F.R. § 1615.23. But there is little reason to believe, as Wastak suggests, that it is intended to disturb the longstanding contract principle that one party's performance is excused by the other party's breach.

asserts that he did not understand the nature and content of the Release. He also claims that at the time the Release was executed he was suffering from "psychological trauma" due to his termination and its accompanying financial consequences.

The record here belies any claim that Wastak signed this Release unknowingly or involuntarily.[9] Although Wastak testified that he was, understandably, not familiar with the particular statutory citations in the Release, when asked directly whether he understood that "in return for the 36 weeks of salary continuation and the out placement services, [he was] agreeing not to sue or file a lawsuit

---

9. Neither party has raised the issue of the proper standard under which we should evaluate Wastak's general claim that the Release was not knowing and voluntary apart from the requirements of the OWBPA. The statute provides that its requirements set only a "minimum," 29 U.S.C. § 626(f)(1), which, the legislative history states, "must be satisfied before a court may proceed to determine factually whether the execution of a waiver was 'knowing and voluntary.' " S. Rep. No. 101-263, at 32 (1990), *reprinted in* 1990 U.S.C.C.A.N. 1509, 1537; *see also* H.R. Rep. No. 101-664, at 51 (1990). Notably, with regard to that factual inquiry, the legislative history explicitly endorses the "totality of circumstances" approach we employed prior to the passage of the statute. *See* S. Rep. No. 101-263, at 32, *reprinted* in 1990 U.S.C.C.A.N. 1509, 1537; H.R. Rep. No. 101-664, at 51; *see also Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451-52 (3d Cir. 1988) (analyzing waiver under a totality of the circumstances test); *Coventry v. U.S. Steel*, 856 F.2d 514 (3d Cir. 1988) (same). In *Long v. Sears Roebuck & Co.*, 105 F.3d 1529 (3d Cir. 1997), to which some courts have cited for the proposition that the OWBPA completely preempts application of the pre-OWBPA totality of the circumstances analysis, we held only that the OWBPA precludes application of the common law doctrines of ratification and tender-back, and specifically stated that "the OWBPA was enacted to 'establish[ ] a floor, not a ceiling.' " *Id.* at 1539 (quoting *Soliman v. Digital Equip. Corp.*, 869 F. Supp. 65, 69 n.13 (D. Mass. 1994)); *see also Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1229 (10th Cir. 1999) (holding that satisfaction of the OWBPA's statutory requirements is not sufficient to establish knowing and voluntary waiver and that courts must inquire into the totality of the circumstances); *Griffin v. Kraft General Foods, Inc.*, 62 F.3d 368, 373-74 (11th Cir. 1995) (same); *EEOC v. Johnson & Higgins*, 5 F. Supp. 2d 181, 186 (S.D.N.Y. 1998) (same). We conclude, therefore, that general considerations that bear on the issue, apart from the statutory prerequisites, are relevant.

against Lehigh Valley," Wastak answered that he did. As for Wastak's claim that he signed the waiver involuntarily given his financial circumstances and fragile mental state, while Wastak correctly notes that such claims should usually be decided by a jury, we agree with the District Court that Wastak has not come forth with sufficient evidence to create a genuine issue of material fact with regard to any lack of understanding or voluntariness on his part in signing the Release. Wastak testified that he was able to comprehend the nature of the Release. He was also of a sufficient mental state to make several attempts to retain legal counsel. Wastak asserts that after he was terminated he faced the prospect of serious financial pressures, conditions that ultimately caused him to suffer severe depression and anxiety, for which he sought psychological treatment and medication. There is, however, no evidence in the record to support the claim that he was experiencing mental impairments when he signed the Release, and the law is clear that the existence of financial pressure to sign a waiver is insufficient to establish that it was executed involuntarily. *See, e.g., Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 452 n.2 (3d Cir. 1988) ("[E]conomic pressure alone is insufficient to establish a claim of duress that would void an otherwise valid release."); *Three Rivers Motor Co. v. Ford Motor Co.*, 522 F.2d 885, 893 (3d Cir. 1975).

Wastak's complaint also seeks relief under the PHRA, but that claim is similarly barred by the Release. As correctly noted by the District Court, the statutory provisions of the OWBPA apply only to ADEA claims, and thus, the effect of the Release with regard to the state PHRA claims is "determined by the ordinary meaning of the language contained therein." *Strickland v. Univ. of Scranton*, 700 A.2d 979, 986 (Pa. Super. Ct. 1997). Here, the Release unambiguously prohibits Wastak from pursuing claims under the PHRA, and Wastak has come forth with no evidence of fraud, duress or other circumstances sufficient to invalidate the agreement. *See, e.g., Bowersox Truck Sales & Serv., Inc. v. Harco Nat'l Ins. Comp.*, 209 F.3d 273, 279 (3d Cir. 2000) (stating, in a case involving Pennsylvania law, that " '[a] signed release is binding upon the parties unless executed and procured by fraud, duress, accident or mutual mistake.' " (quoting *Three Rivers Motors*, 522 F.2d

at 892); *Davis v. Gov't Employees Ins. Co.*, 775 A.2d 871, 875 (Pa. Super. Ct. 2001) (same); *Strickland*, 700 A.2d at 986 (same).

## III.

John Wastak and Lehigh Valley executed a valid release pursuant to which Wastak agreed to waive his right to bring ADEA and related claims arising out of his employment and termination in exchange for thirty-six weeks of income protection and other benefits. Accordingly, we hold that the present claims are barred, and that the District Court correctly entered summary judgment in favor of Lehigh Valley.

For all of the foregoing reasons, the order of the District Court will be AFFIRMED.

A True Copy:
      Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*